IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 17, 2002 Session

## GENERAL CONSTRUCTION CONTRACTORS ASSOCIATION, INC., v. GREATER ST. THOMAS BAPTIST CHURCH

**Direct Appeal from the Chancery Court for Shelby County**
**No. 105579-2      Floyd Peete, Jr., Chancellor**

**No. W2001-01588-COA-R3-CV - Filed December 10, 2002**

This appeal arises from a dispute over the construction of a church. Both parties alleged that the other breached the construction contract. The trial court found the Church to be in breach, awarded damages to the Contractor, and this appeal ensued. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

James H. Kee, Memphis, Tennessee, for the appellant, Greater St. Thomas Baptist Church.

Regina C. Morrison and James W. Hodges, Jr., for the appellee, General Construction Contractors Association, Inc.

**OPINION**

In May, 1994 General Construction Contractors Association, Inc., d/b/a General Construction Contractor Associates, Inc. (GCCA) entered into a contract with Greater Saint Thomas Baptist Church (Church) to construct a church facility in Memphis, Tennessee. Construction began on this facility in August of the same year. Problems during the construction increased the cost of the job, and a dispute arose between GCCA and the Church over who was responsible for paying these increases. The dispute resulted in a verbal agreement by the Church to pay part of the increased costs. To avoid future problems, it was decided that all remaining correspondence between GCCA and the Church should pass through a surety company. This

company would receive GCCA's invoices and pay them. Also during this meeting, Church approved the payment of the first "draw" to the surety company[1].

In mid-October, GCCA ceased work on the site stating that additions or corrections to the plans and specifications would be needed before construction could continue. Shortly thereafter, GCCA submitted a second "draw" application to the surety company, including some items included from the first "draw" request, but not yet paid. The Church did take steps to check the second "draw" request, though it never paid any money on it. In November, an attorney for the Church requested, pursuant to its contract rights, copies of documents related to GCCA's construction work. GCCA responded with a letter stating it was owed several thousand dollars by the Church through its failure to pay its "draw" requests and that "[GCCA would] not continue to do all of the work and not be compensated." GCCA then referred all future correspondence from the Church to its legal counsel. In December, Church notified GCCA it was terminating the contract for "nonperformance." In April, 1995, GCCA filed a complaint seeking to attach its lien against the property.[2] GCCA subsequently filed suit seeking not only the lien amount, but also lost profits and additional damages. The Church filed a counterclaim against GCCA alleging breach of contract and seeking damages. The trial court, sitting without a jury, found that the Church, and not GCCA, had breached the contract between the parties in an Order dated October 21, 1996. As such, the Church was denied relief and GCCA was granted damages,[3] the determination of which was reserved pending submission of post trial briefs as to damages. The chancellor issued a Final Judgment on December 2, 1998, awarding GCCA actual damages in the amount of $35,868.54, lost profits of $76,200.00, recording fees of $220.00 and "pre-judgment interest in the statutory amount to begin October 10, 1994 to the date of entry of this Court's final judgment."

On December 30, 1998 the Church filed a Motion to Alter or Amend/New Trial. GCCA responded to this motion with its own Motion to Strike, stating that an 'attorney of record' had not filed the motion within the required period. Upon receiving a copy of GCCA's motion, the Church's trial lawyer signed the motion. Nevertheless, the trial court granted the 'Motion to Strike.' On appeal to this Court (Church I), the Church argued that an undisputed 'attorney of record' had signed the motion as permitted under the Tennessee Rules of Civil Procedure. In an

---

[1]A "draw" is a partial payment for work completed in a construction contract. In this case, a "draw" request would be submitted to the Church. The Church's representative would check and approve all or part of the "draw" request and those approved funds would be paid to GCCA.

[2]GCCA's Notice of Lien was registered and recorded in the Shelby County Registrar's Office on December 22, 1994. Notice of the lien was contemporaneously received by the Church.

[3]It should be noted that GST was granted a judgment against the Surety in the amount of $112,068.35, who could not be located and was never served. This amount differs from the amount awarded GCCA by a mere nineteen cents, and presumably was meant to reflect the actual judgment against GST. If the Surety were to be subsequently located, and this judgment were allowed to stand, the result would be a windfall for GST. Accordingly, GST's judgment against the Surety is modified to reflect the amount of the final judgment on this appeal.

order dated October 9, 2000 this Court agreed that the trial court's granting of the 'Motion to Strike' was in error and remanded the case for consideration of the Church's 'Motion to Alter or Amend/New Trial.' The Church, as Appellant in Church I, had presented several additional issues for decision by this Court, which we declined to address as they did not bear upon our decision. In remanding the case, this Court noted that the trial court had never considered the Church's motion on its merits and specifically stated that either party would have the option to perfect a timely appeal following such a ruling by the trial court. In other words, the only issue before this Court in Church I was the propriety of the order granting GCCA's Motion to Strike. The other issues raised by Appellant were, therefore, not addressed.

On February 8, 2001, subsequent to this Court's decision, but prior to the trial court's ruling on the Motion to Alter or Amend/New Trial, the Church submitted a First Amendment to Motion to Alter/New Trial, adding thirteen additional assignments of error to the four alleged in the original motion. The trial court denied the Church's Motion to Amend/New Trial by an order dated June 15, 2001. In the order the chancellor specifically stated that the order was based upon, *inter alia*, "Defendant's First Amendment to Motion to Alter Judgment/For New Trial . . . ." This appeal followed.

Appellant presented twelve (12) issues on appeal, discussion of the following six (6) are necessary for our determination of this matter:

(1)    The Chancellor erred in concluding that the Church breached the contract and in concluding that GCCA did not breach the contract.

(2)    The Chancellor erred in the construction and/or application of the construction contract by failing to conclude same was an absolute contract containing the contractor's express warranty that the plans and specifications were sufficient to complete the work and obligated the contractor to perform any misdescribed or omitted work without additional cost to the owner.

(3)    The Chancellor erred in failing to conclude that the contractor received payment of all sums due contractor under the first draw request and contractor's delivery, pursuant to agreement, of said funds to the surety for payment of contractor's bills on the project, merely constituted the surety the agent of the contractor for payment of the bills, and the contractor's contention that it "received no money" from the project does not constitute non-payment by the Church.

(4)    The Chancellor erred in awarding compensatory damages in the amount of $35, 868.54 in that the "unpaid bills" and "expenses" claimed by the contractor and awarded by the Chancellor had either been paid by the

Church on the first draw request or were unearned by the contractor or were otherwise not established by a preponderance of the evidence.

(5)    The Chancellor erred in awarding contractor $76,200 for lost profits since the evidence does not establish the likelihood that the contractor sustained any damage in the form of lost profits and the award of lost profits is based on conjecture and speculation.

(6)    The Chancellor erred in awarding prejudgment interest from October 10, 1994 to date of Final Judgment on December 2, 1998.

Additionally, Appellee raises the following two issues:

(1)    That "[t]he issue of any breach of contract by GCCA was adjudicated, is *res judicata*, and is precluded from re-consideration in this appeal. The Trial Court's judgment on the Appellant's Counterclaim that GCCA did not breach the contract is "the law of the case", [sic] therefore, all Appellant's arguments on appeal that GCCA breached and should not recover are precluded[,]" and

(2)    that numerous issues of the Appellant "were never addressed or raised at trial, nor timely presented in a post-trial motion, and are therefore precluded from consideration in this appeal."

## Standard of Review

In a civil action we review a trial court's findings of fact *de novo* upon the record of the trial court. Such review is accompanied by a presumption of correctness, unless the evidence preponderates against such findings. Tenn. R. App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d 403,404 (Tenn. 1999). Questions of law are reviewed *de novo*, with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

## Appellee's Issues

At the outset, we address the issues raised by Appellee. Appellee argues that the issues contained in Appellant's First Amendment to Motion to Amend/New Trial should not be considered as the Motion was untimely filed. This argument is without merit, as the "rule . . . is that the filing of a motion for a new trial on any grounds suspends the judgment *and the running of time for filing amended motions for new trials* until the first motion is ruled upon and the ruling duly becomes a part of the minutes." *Webb v. Aetna Life Ins. Co.*, 496 S.W.2d 511, 515 (Tenn. Ct. App. 1973) (emphasis in original). Appellant filed the amended motion on February 8, 2001. The chancellor did not rule on the original motion until June 15, 2001, and in doing so specifically stated that he was denying not only the original motion, but also the amended motion "upon the merits of all of the

issues raised by [Appellant]." Accordingly, the issues were "timely presented in a post-trial motion, and are therefore [not] precluded from consideration in this appeal."

Appellee also contends that the Trial Court's "judgment on the Appellant's Counterclaim that GCCA did not breach the contract is 'the law of the case', [sic] therefore, all Appellant's arguments on appeal that GCCA breached and should not recover are precluded." This contention is also without merit.

The Tennessee Supreme Court has stated that "[t]he phrase 'law of the case' refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided *in a prior appeal* of the same case." *Memphis Publ'g Co. v. Tenn. Petrol. Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (emphasis added) (citing 5 Am. Jur. 2d *Appellate Review* § 605 (1995)). "[U]nder the law of the case doctrine, *an appellate court's decision* on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Id.* (citations omitted) (emphasis added). As previously noted, the only issue considered in Church I was the propriety of the Trial Court's order granting GCCA's Motion to Strike. No other issues were decided by this Court in Church I. The "law of the case" doctrine, therefore, does not bar consideration of any issue raised by Appellant on this appeal.

## The Contract
### Breach

The trial court held that GST breached the contract in question by failing to pay the second draw request within the time provided in the contract. This was a factual determination and, therefore, is afforded a presumption of correctness, unless the preponderance of the evidence suggests otherwise. Tenn. R. App. P. 13(d). After a thorough review of the record, and the attendant exhibits, we cannot say that the evidence preponderates against the finding of the trial court that GST breached the contract by failing to pay the second draw request per the terms of the contract.

### Characterization

GST alleges that the chancellor erred in the construction and/or application of the construction contract by failing to conclude same was an absolute contract containing the contractor's express warranty that the plans and specifications were sufficient to complete the work and obligated the contractor to perform any mis-described or omitted work without additional cost to the owner. While this question of characterization plays no part in the analysis of which party breached the contract, it is necessary for the proper computation of damages and, therefore, must be addressed.

Contract interpretation is a question of law and our review is *de novo*. *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983). In the present case, the contract

states that "[t]he Owner and the Contractor have agreed to a Lump Sum Price[,]" and "[t]he Contractor shall provide for the Lump Sum Price set forth herein, all of the labor, materials, supplies, tools, equipment, facilities, overhead, profit and insurance necessary to construct the Church." Appellee contends that as "the Contract Documents were subject to being corrected, interpreted and clarified, [the contract was] not 'absolute.'" We disagree with this contention.

"In the absence of fraud or mistake, courts should construe contracts as written." **Marshall v. Jackson & Jones Oils, Inc.**, 20 S.W.3d 678, 681 (Tenn. 1999). Contractual terms should be accorded "their natural and ordinary meaning." **Id.** "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention. . . ." **Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.**, 521 S.W.2d 578, 580 (Tenn. 1975). While GCCA contends that GST has not defined what is meant by the term "absolute contract," we believe the meaning is clear from the aforementioned provisions of the contract. Applying the natural and ordinary meaning of the term "lump-sum," it is apparent that the parties intended that GCCA would build a Church for the fixed price of $508,000.00.[4]

Appellee further contends that the provisions in the contract allowing for change orders, and those addressing measures to be taken if problems with the contract documents were noted, somehow make this interpretation an erroneous one. Mindful that "[a]ll provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract[,]" **Rainey v. Stansell**, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992), we have no problem harmonizing the concept of a lump-sum contract with provisions allowing for changes to the contract documents, or extra work to be performed, to allow for the completion of the Church. Appellee contends that "Article 11 of the Contract clearly provides for change orders affecting both extra work and the lump sum contract price[,]" and, therefore, that "the contract price was not 'absolute.'" Appellee fails to note, however, that this provision of the Contract gives only GST the power to initiate changes in the work. Article 6.02 (a) of the Contract provides in pertinent part that "Contractor shall not be paid any amounts exceeding the Lump Sum Price unless the Lump Sum Price is modified by any changes in the Work pursuant to Article 11." Article 11, section 11.01(b) states that "no extra Work or change in the Work shall be made unless pursuant to a Change Order and no claim by the Contractor for additional cost, expenses, overhead or profit . . . shall be valid unless so ordered in a written Change Order. . . ." This section must be read in concert with the preceding section, 11.01(a), which provides that "*[t]he Owner*, without invalidating the Agreement, may order extra work or make changes by altering, adding to or deducting from the Work by executing a Change Order . . . ." There is no provision allowing GCCA to order extra work or make any changes. When considered *in toto*, these provisions make it clear that the contract was one for a fixed, or lump sum price with allowance for *GST* to

---

[4] The correctness of this interpretation, and GCCA's understanding of it, is supported by the following statement of Mr. White, contained within a letter to Rev. Harris dated November 18, 1994: "Although, [sic] *this is a fixed contract* it does not give the owner the right to take advantage of this contract when he knowing [sic] knew that the structure documents did not portray an accurate concept of the building." (emphasis added)

make changes. If such changes were made, then GST would bear the additional costs, if any, occasioned by the change. If GST requested no changes, however, GCCA would have to complete the job for the agreed price.

This provision for additional costs to be borne by GST negates GST's assertion that GCCA was obligated to perform **any and all** misdescribed or omitted work without additional cost to GST. By the terms of the contract, it was GCCA's duty to notify GST of any discrepancy, and it was GST's duty to respond to that notice. If the discrepancy was of such magnitude that the Church decided a Change Order was appropriate (which only GST possessed the power to decide) then any additional work would result in increased cost to the Church. Accordingly, the trial court erred in its finding that the contract at issue was not an absolute, or fixed price contract, but did not err in finding that GCCA was not required to absorb **all costs** resulting from discrepancies in the contract documents. GCCA could avoid bearing the cost of work necessitated by discrepancies in the contract documents, but only by following the aforementioned procedure and allowing GST to initiate a change order.

As noted, notwithstanding the fixed price, or lump sum, nature of the contract, the contract provided a procedure by which the parties were to correct "any error, inconsistency, omission or discrepancy or variance in the Contract Documents. . . ." In such a case the Contractor was to "notify the Owner of any errors discovered at least two (2) days before beginning the affected portion of the work[,]" at which time "[t]he Owner shall make any correction, interpretation or clarification promptly, basing its decision on the intent of the Contract Documents." This provision, when considered in concert with various other provisions of the contract, GCCA argues, results in ambiguity as to who is responsible for corrections to the Contract Documents. We fail to find this provision ambiguous. It clearly places the duty of correction, interpretation or clarification of the Contract Documents, as opposed to the physical work itself, upon GST. This duty was to be triggered by notice of such discrepancies by GCCA. Even assuming, however, that the language of the contract is ambiguous, it doesn't change the end result for "the language of [a] contract, where ambiguous, will be construed most strongly against the party who drew it[,]" in this case, GST. *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968). Accordingly, any corrections, interpretation or clarifications required of the Contract Documents were the responsibility of GST whether or not the contract is deemed ambiguous. The contract also provides for GST to be given notice of any problems two days prior to GCCA beginning the affected portion of the work. Presumably, this would allow GST time to make any corrections necessary to the Contract Documents and, if necessary, draft a Change Order, which would ensure that GCCA would neither lose nor gain money based on the changes.[5] As previously noted, the only way, per the contract, for GCCA to be reimbursed for

---

[5] The contract contained the following provision:

    a) The increase in the Lump Sum Price attributable to a Change Order performed by the Contractor or any of its subcontractors shall not exceed the sum of the following:
        (i) The actual labor cost to perform the Change Order, including insurance

(continued...)

any work not called for in the Contract Documents was via a valid Change Order, which only GST could authorize.

This procedure was not followed in the case of the concrete slab. Mr. White testified that the change order that GCCA attempted to submit was never signed or approved by GST. GCCA contends that they had no choice but to go ahead and pour the extra concrete, which may be entirely true. Unfortunately for GCCA, however, the immediacy of the situation does not bear upon GST's duty to pay for the changes. As discussed, the only way for GCCA to be reimbursed over and above the lump sum price was per a valid Change Order. Per the contract, only GST had the power to initiate a Change Order. GCCA's failure to give GST the required notice as to the deficiency in the Contract Documents with regards to the concrete slab, thereby not allowing GST to initiate the Change Order procedure, is fatal to their claim for damages resulting from the inconsistencies in the plans and specifications. "It is the function of a court to interpret and enforce contracts as they are written, notwithstanding they may contain terms which may be thought harsh and unjust." *Smithart v. John Hancock Mut. Life Ins. Co.*, 71 S.W.2d 1059, 1063 (Tenn. 1934). GCCA was contractually bound by the provisions of the contract requiring that it bring any discrepancies to the attention of GST, or bear the burden of correcting such discrepancies itself.

Determination of the amount due GCCA for the work done on the concrete slab necessitates a discussion of the effect of the agreement between GST, GCCA, the Bank and the Surety as to how draw payments were to be made. The parties concur that an agreement was reached at the meeting between GST, GCCA, the Bank and the Surety held on September 27th, 1994 providing that the bank would pay any funds approved per draw requests to the bonding company instead of GCCA and the bonding company would in turn pay the subcontractors based upon invoices submitted by GCCA.

Acknowledging that an agent is "simply one who undertakes to transact some business, or to manage some affair, for another, by the authority and on account of the latter[,]" *Sec. Fed. Sav. & Loan Ass'n v. Riviera, Ltd.*, 856 S.W.2d 709, 715 (Tenn. Ct. App. 1992) (internal quotations omitted), it is clear that the agreement reached at the aforementioned meeting established the surety as the agent of GCCA for the purposes of receiving and disbursing the funds received from the draw requests. At this same meeting GCCA endorsed a check in the amount of $21,570.00 over to the bonding company. This amount reflected the total amount approved for the first draw request. This draw request was drafted subsequent to the pouring of the concrete slab, including that portion not called for in the original plans. This first draw requested $10,000 for concrete work, of which $8,820 was approved by the Church's

---

[5](...continued)
       and taxes;
               (ii) The actual unit cost of materials used in performing the Change Order,
       including sales taxes.
               (iii) The subcontractor's total price to Contractor for the Change; and
               (iv) The actual cost for additional bond.

representative. No further concrete work was done from the time of the request until GCCA stopped work. Accordingly, the only amount approved for payment of the concrete work was the $8,820 reflected in the first draw request. When GST, through the Bank, paid GCCA the $21,570 first draw, which included the $8,820 due for the concrete work, they completely paid for the concrete work. Any amount over and above this was not authorized per a valid change order initiated by GST and, therefore, as previously discussed, GST was not contractually obligated to pay such amount.

GCCA contends that they "received no money" from the first draw request. This contention is without merit. GCCA received $21,570 which they subsequently endorsed over to their agent for payment of the funds to subcontractors. GCCA retained full control over how the funds were to be disbursed. The surety, as agent, was only authorized to make payments to those subcontractors from which the agent received invoices from GCCA. GCCA, therefore, retained full control over which subcontractors would be paid. If the bill for the concrete work was not paid, it was not because the Church failed to pay. If the surety or GCCA decided to use the funds earmarked for the payment of the concrete work to pay other invoices, whether valid or not, they did so at their own peril, for the Church had fully paid for all items listed on the first draw request, including the concrete. Accordingly, GCCA is not entitled to the $8,700.09 requested for the concrete slab nor the $7,686.20 requested for sand and concrete finishing. These sums represent bills for work already paid on the first draw request, or amounts reflected in the change order GCCA submitted which, as discussed, is a nullity. As such, the trial court's award of these amounts is reversed.

### Salaries

As part of the $35,868.54 that GCCA claims as damages flowing from GST's breach, $8,000 is claimed to be owing for "salaries." Determination of the propriety of awarding this sum to GCCA requires revisiting the testimony of Mr. White as to the how salaries were computed for this job.

Q: You got an item on here, eight thousand dollars, salaries, GCCA, Inc. I think actually somewhere there is an item that reflects these are salaries from August 1st of 1994 to the end of September; is that correct?

A: That would be correct.

Q: Salaries, eight thousand dollars. Mr. White, I don't see anything in your application document, I don't see anything in your job breakdown that reflects a contract price that has a separate category called salaries. Can you tell me if there is one in here?

A:     No, sir, there is not one in here, there is not one in there and there is not one on any contract, on any breakdown that we have got over the last few years.

Q:     So, actually, *salaries are figured into all these other items, aren't they*?

A:     *Yes, they are*.

THE COURT: What do you mean *all the other items or every item*, which one?

WITNESS: *Every item*.

Mr. White's own testimony makes it clear that this request for "salary," in addition to the request for payment of specific items would, if granted, amount to a windfall for GCCA. Accordingly, the $8,000 in damages awarded by the trial court was in error and that portion of the damages award is reversed.

### Remaining Damages Claimed

GCCA also claims that GST owes $2,540 for "demolition" and $4,525 for "job set-up." The first draw request, for which GCCA received $21,570, included $8,000 for demolition- the full amount allotted for that task. As discussed, GST met its payment obligation for all items listed on the first draw request. As the $8,000 represented the total amount that GCCA may claim for such work, GST's obligation as to payment for "demolition" was fully satisfied upon payment of the first draw request. Accordingly, the trial court's award of $2,540 for "demolition" was in error and is reversed. Likewise, GST paid $2,000 toward "job set-up" on the first draw, an amount which must be applied to the $4,525 claimed by GCCA as a set off. To allow the full $4,525 award to stand would result in GCCA being paid $6,525 for "job set-up" when the total amount to be received for all such work, per the contract, was $4,525. The award for "job-set up" is therefore reduced by the $2,000 already paid, for a total award of $2,525. The award of the remaining damages reflected in the lien, $6,942.25 (arrived at by subtracting the $8,700.09 for concrete work, $8,000.00 for salaries, $7,686.20 for concrete finishing, $2,540.00 for demolition, and the $2,000.00 already paid towards job set-up, from $35,868.54), is affirmed as the evidence does not preponderate against such an award.

### Lost Profits

Tennessee allows recovery for "lost or expected profits . . . as damages for breach of contract, provided they can be proved with reasonable certainty, and are not in fact remote or speculative." *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publ'g Inc.*, 298 S.W.2d 788, 793 (Tenn. Ct. App. 1956) (citations omitted). "[N]o recovery can be had for loss of profits which are uncertain, contingent, conjectural, or speculative [and] no recovery can be had for loss of profits where it is uncertain whether any profit at all would have been made by the plaintiff."

*Id.* With respect to the issue of profit for this particular project Mr. White, the president of GCCA, provided the following testimony on direct examination:

Q:      Okay.  What is your profit margin on a construction contract?

A:      It varies.  We try to get fifteen percent.  It varies between eleven and a half to fifteen percent.  It varies.

Q:      All right.  When you bid a contract, though, do you build in the fifteen percent?

A:      Normally you do.

Q:      Okay.  Can your company do as many contracts as it can get?

A:      Yes.

Q:      So, how much did GCCA lose?  How much would GCCA lose on this contract if the contract were not to be performed?

A:      Well, you would lose your profit margin.  Whatever your profit margin would be, you would lose that.

Q:      Okay.  And on this contract, that was fifteen percent?

A:      Yes.

On cross examination, while being questioned about employee salaries, Mr. White provided the following insight into how he arrived at the stated profit margin:

Q:      Salaries, eight thousand dollars.  Mr. White, I don't see anything in your application document, I don't see anything in your job breakdown that reflects a contract price that has a separate category called salaries.  Can you tell me if there is one in here?

A:      No, sir, there is not one in here, there is not one in there and there is not one on any contract, on any breakdown that we have got over the last few years.

Q:      So, actually, salaries are figured into all these other items, aren't they?

A:      Yes, they are.

THE COURT: What do you mean all the other items or every item, which one?

WITNESS: Every item.

THE COURT: The percentage goes to salary?

WITNESS: And overhead.

THE COURT: Is there a fixed percentage normally? How do you know what to take out for salaries is what I'm trying to determine.

WITNESS: Well, basically, I guess - - well, basically, what you do is you separate your profit and your salaries from your overhead and you figure that your overhead is going to run five and a half percent on the job, that is how you are going to come up with your - -

THE COURT: What is left is salary?

WITNESS: That would be the salary and then you come up with the profit after that.

The testimony of Mr. White was the only proof offered as to lost profits. We are aware that "[w]hen lost profits are the proper measure of damages, they need only be proved with reasonable certainty, not with mathematical precision." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 200 (Tenn. Ct. App. 1990) (citations omitted). It is well established in Tennessee jurisprudence, however, that "[t]he allowance of profits . . . is wholly a question of the certainty of proof. Whenever there is [a] . . . breach of contract, . . . the gains prevented, *if proven*, may be recovered. As a general rule the expected profits of a business cannot be proved, and therefore cannot be recovered. They might have been made, and they might not. . . . Instead of profits, there might have been losses." *Chisholm & Moore Manuf. Co. v. United States Canopy Co.*, 77 S.W. 1062, 1064 (Tenn. 1903) (emphasis added). Considering Mr. White's minimal experience with projects of this size, and the problems which had arisen in the performance of the contract prior to the stoppage of work, any claim of expected profit on the part of Mr. White could only be conjecture. *See Anderson-Gregory Co. v. Lea*, 370 S.W.2d 934, 938 (Tenn. Ct. App. 1963) (finding plaintiff's lack of experience fatal to his request for lost profits) and *Kimbrough Constr. Co.*, 806 S.W.2d at 201 (refusing to allow plaintiff to recover the profits he originally planned to make on the job due to the fact that assumptions used in calculating the profit had proven to be invalid). In order to realize fifteen percent profit on the job, the job would have to have progressed without a hitch, and according to Mr. White's own testimony, "[t]here is no job that you are going to not have a problem with." Accordingly, we find that Mr. White's testimony as to the amount of lost profits in this case fails to meet the test of "reasonable certainty" required for such an award and reverse the trial court's award of lost profits.

## Prejudgment Interest

Appellant disputes the chancellor's award of prejudgment interest for the period between the trial date, May 3, 1996 and December 2, 1998, the date the trial court entered its "Final Judgment." Appellant argues that to allow an award of interest for this period, during which the trial court held the case under advisement, is an abuse of discretion.

The decision to award prejudgment interest "is within the sound discretion of the trial court[,]" and this Court will not disturb such a decision "unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) (citations omitted). Prejudgment interest is awarded to compensate the party that has been wronged "for the loss of the use of the money it should have received earlier[,]" and not as punishment to the wrongdoer. *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000) (citations omitted). Prejudgment interest "may be awarded . . . in accordance with the principles of equity[,]" Tenn. Code. Ann. § 47-14-123 (2001), and "[f]airness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Id.* at 83.

There are, however, circumstances which may make the award of prejudgment interest inappropriate, including situations where "the party seeking prejudgment interest has been . . . inexcusably dilatory in pursuing a claim [or] has unreasonably delayed the proceedings after suit was filed [or such party] has already been otherwise compensated for the lost time value of its money." *Id.* (internal citations omitted). While this is certainly not an all inclusive list of reasons justifying the denial of prejudgment interest, it is clear that none are applicable in this case. The delay complained of by Appellant was not caused by any action of the Appellee, nor for that matter any action of the Appellant. While it may seem unjust to Appellant that the meter continued to run on the accrual of interest during the time that the trial court held the case under advisement, it could be viewed as equally unjust to the Appellee to discount this time in computing the total amount of damages due. The trial court was required to "decide whether the award of prejudgment interest [was] fair, given the particular circumstances of the case." *Myint*, 970 S.W.2d at 927. We do not believe that the trial courts award of prejudgment interest, to include the time the case was held under advisement[6], amounts to a "manifest and palpable" abuse of discretion. The award of prejudgment interest is, accordingly, affirmed.

## Conclusion

---

[6] This is not to say that a modification may never be appropriate in such circumstances. *See, e.g., Varner Constr. Co. v. Marrs*, No. W2000-01029-COA-R3-CV, 2002 Tenn. App. LEXIS 275 at *39 (Tenn. Ct. App. Apr. 18, 2002) (*no perm. app. filed*) (stating that, in order to avoid unjustly punishing the party ordered to pay, unusual duration of the litigation could be considered as a factor in determining the amount of a prejudgment interest award, where master's report was not issued for seven years).

In summary, we affirm the trial court's conclusion that the defendant, Greater Saint Thomas Baptist Church breached the contract. The award of lost profits is reversed. The judgment of the trial court is modified by reducing the judgment to $6,942.25. The award of prejudgment interest is affirmed. In addition, equity demands that we modify GST's judgment against the Surety to reflect the total amount of this judgment. The judgment is, therefore, so modified.

The judgment of the trial court is affirmed as modified and this case is remanded. We tax the costs of this appeal equally to Appellee, GCCA, and Appellant, GST, and its surety for which execution, if necessary, may issue.

_____
DAVID R. FARMER, JUDGE