# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 8, 2003 Session

## WAGGONER MOTORS, INC. v. WAVERLY CHURCH OF CHRIST

**Appeal from the Circuit Court for Humphreys County**
**No. 8699     Robert E. Burch, Judge**

---

**No.  M2002-01165-COA-R3-CV - Filed September 16, 2004**

---

This appeal involves an automobile dealer whose vehicles were damaged by paint overspray from a church's construction project on adjacent property.  The dealer filed suit against the church in the Circuit Court for Humphreys County seeking damages for the cost of cleaning the vehicles and lost profits.  Following a bench trial, the trial court determined that the church had not properly supervised the painting and that the paint overspray had damaged the automobile dealer.  Accordingly, the trial court awarded the dealership $344,778 in damages and $11,170 in discretionary costs.  On appeal, the church takes issue with the trial court's decisions regarding liability, damages, and discretionary costs.  The dealer also takes issue with the damages award.  The dealer's evidence regarding its lost profits is too speculative to support the trial court's judgment.  However, we have determined that the evidence supports a judgment for $85,692.  We have also determined that the trial court erred with regard to a portion of the discretionary costs.  Accordingly, we reduce the dealer's damages to $85,692.00 and modify the award for discretionary costs to $8,501.25.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed as Modified

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

James D. Kay, Jr., Matthew Brothers, and Jeanette Armington, Nashville, Tennessee, and Robert I. Thomason, Waverly, Tennessee, for the appellant, Waverly Church of Christ.

Dan R. Bradley, Waverly, Tennessee, for the appellee, Waggoner Motors, Inc.

## OPINION

## I.

Waggoner Motors, Inc. ("Waggoner") is an automobile dealer that has sold Chrysler and Chevrolet automobiles in Waverly since September 1991.  It is located at 401 West Main Street, adjacent to the Waverly Church of Christ.  Sometime in early 1997, the church, acting as its own general contractor, began constructing a 9,000-square-foot general purpose building in back of its

existing building. By June 1997, the steel beams and trusses and the roof had been installed, but the walls had not been erected.

The church hired Ronald E. Bare to paint the steel beams supporting the roof and instructed him to perform the work on June 17, 1997. Notwithstanding Mr. Bare's concern about the weather conditions on that day, the church and its construction supervisor directed him to begin painting the beams using an airless paint sprayer. The wind began to blow in the direction of Waggoner but Mr. Bare continued working for several more hours.[1] Sometime during the afternoon, a representative of Waggoner informed the church that many of the cars parked at the dealership were covered with fine droplets of silver paint. On the morning of June 18, 1997, the church elder overseeing the project and the construction supervisor hired by the church instructed the painter to complete the work without using the sprayer and agreed to pay for the additional time it would take to finish the job.

As it turned out, the paint spray damaged fifty-two new vehicles, thirty-seven used vehicles, and three vehicles owned by Waggoner's customers. Ronald K. Waggoner, Sr., one of Waggoner's owners, contacted his lawyer soon after the incident seeking advice regarding the sale of the paint-damaged vehicles. Acting on his lawyer's advice, he declined to sell any of the vehicles until the paint had been removed and disclosed the incident to all customers interested in purchasing the affected vehicles.

A representative of the church's insurance company assured Mr. Waggoner shortly after the incident that he would arrange for the vehicles to be cleaned and detailed. In mid-July, after hearing nothing from the church's insurance company, Mr. Waggoner contacted Chrysler Insurance Company[2] and Cincinnati Insurance Company[3] to obtain permission to hire Detail Master to clean the vehicles. This work was completed approximately three weeks later with varying degrees of success. Waggoner eventually sold all of the vehicles that had been damaged by the paint overspray by the end of 1997.[4]

On June 23, 1997, Mr. Waggoner telephoned Howard Forrest, Chrysler's Dealer Relations Manager, to inform him that paint overspray had damaged his entire inventory. This telephone call triggered Chrysler's review of Waggoner's current finances. Apparently Chrysler had had concerns before the incident about Waggoner's capitalization, as well as the fact that the amount of its floor

---

[1] The evidence is not consistent regarding the reasons why Mr. Bare stopped painting in mid-afternoon. He testified that the scissor lift he was using broke. The church's construction supervisor stated that he ran out of paint.

[2] Chrysler Insurance Company covered Waggoner's new vehicle inventory.

[3] Cincinnati Insurance Company covered Waggoner's used vehicle inventory.

[4] The record contains no evidence regarding when each of these vehicles was sold or the amount of profit or loss on each automobile.

plan financing[5] was greater than the amount warranted by its sales. Mr. Forrest visited Waggoner on June 24, 1997, and informed Mr. Waggoner that Chrysler had decided to "freeze" the floor plan at its current level. He also repeated Chrysler's continuing concern about Waggoner's inability to sell its over-aged inventory.

Several weeks later, Mr. Waggoner purchased five Chrysler "program" cars at a wholesale auction in Nashville. He intended to use his floor plan to finance the purchase but discovered when he returned to Waverly that Chrysler had declined to approve the financing. When he telephoned Kevin Spivey, Chrysler's Zone Dealer Credit Manager, he discovered that Chrysler had reduced the amount of his floor plan from $400,000 to $200,000. In July 1997, Mr. Waggoner and his co-owner were required to borrow $90,000 to pay for the vehicles purchased in Nashville.

In October 1997, Waggoner filed a negligence action against the Waverly Church of Christ. The church denied liability on the ground that it was not responsible for the negligent acts of the construction supervisor and the painter because they were independent contractors. In April 2000, Cincinnati Insurance Company filed an intervening complaint seeking to recover the $13,241.68 it had paid for the professional cleaning of Waggoner's used vehicles. In July 2000, the trial court denied the church's motion for partial summary judgment seeking dismissal of Waggoner's lost profits claim.[6]

The bench trial began on September 24, 2001. In general terms, Waggoner's case was based on its assertion that the overspray incident had caused Chrysler to cut back its floor plan financing, and that the reduction in floor plan financing had devastating, long-term effects on its ability to acquire and sell new and used vehicles and, therefore, on its profits. The church's defense essentially was that Waggoner had serious financial problems before the overspray incident occurred and that Chrysler's reduction of Waggoner's floor plan financing was the result of these problems, not the overspray incident. The church also asserted that the financial impact of the overspray incident on Waggoner's profits was minor and relatively short-lived.

Waggoner asserted that it had sustained approximately $718,000[7] in damages as a result of the overspray incident. Its evidence regarding damages came from three witnesses – Mr. Waggoner himself; James Lavender, the dealership's accountant; and Michael P. Kelsay, an economist retained

---

[5]Floor plan financing is a form of retail goods inventory financing common in the automotive industry. Each loan advance is made against a specific vehicle. As each vehicle is sold by the dealer, the loan advance against that vehicle is repaid. A floor plan lender's exposure to loss is generally greater than other forms of inventory financing because the lender is unable to exercise full control over the floored vehicles.

[6]There is a substantial question regarding whether Waggoner might be barred from recovering lost profits because it is an Internal Revenue Code Subchapter S corporation. 1 Robert L. Dunn, *Recovery of Damages for Lost Profits* § 6.32, at 521-22 (5th ed. 1998) ("*Recovery of Damages for Lost Profits*"). However, we will not address this potential argument in this case because the church did not raise it in the trial proceedings. *Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000); *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 522 (Tenn. Ct. App. 2002).

[7]Waggoner claimed $717,787.07 in damages consisting of $508,663.00 in lost profits and $209,124.07 in other damages.

to calculate Waggoner's lost profits. Mr. Waggoner testified in quite general terms about the effect of the overspray incident on the business.[8] He described the problems and delay in having the automobiles cleaned. He discussed the increased payroll expenses resulting from his decision to continue to pay his sales staff even though they had fewer vehicles to sell and the impact the loss of sales had on his future allocation of new vehicles from Chrysler. He also explained that he and his partner had been forced to borrow money to "band aide" the business. Mr. Waggoner testified that the dealership's damages, excluding its lost profits, were $209,124.07.[9]

The most significant component of Waggoner's damages claim consisted of its alleged lost profits resulting from the overspray incident. Both Mr. Lavender and Dr. Kelsay stated that the reduction in Waggoner's floor plan financing had a "devastating" effect on Waggoner's business. Comparing the dealership's performance following the incident with its performance during the three full calendar years immediately preceding the incident,[10] Dr. Kelsay testified that the dealership had experienced an incremental loss of profits in the amount of $405,457. After adjusting this loss to its present value, Dr. Kelsay opined that Waggoner was entitled to recover $508,663. Dr. Kelsay also testified that Waggoner would continue to be damaged by the overspray incident until its profits returned to his three-year baseline average and its floor plan financing was restored to its pre-incident level.

The church's evidence on the first day of trial regarding Waggoner's damages consisted of the testimony of Donald H. Carpenter, a certified public accountant employed by a firm experienced in calculating economic damages. After analyzing Waggoner's records, Mr. Carpenter concluded that the dealer had been experiencing a steady decline in sales during the two years immediately preceding the overspray incident and that the rate of loss in the six months immediately preceding the incident was greater than the rate during the past two years. He also determined that the records did not show any loss of income traceable to the incident after November 1997. Mr. Carpenter then presented five alternatives for calculating Waggoner's damages traceable to the overspray incident.[11] Depending on the alternative chosen, the damages ranged from $10,624 to $44,304. These figures were not adjusted to reflect their present value.

---

[8] Mr. Waggoner provided surprisingly little detail regarding the incident's actual impact on sales and exhibited a lack of in-depth familiarity with the financial details of the operation.

[9] These damages include $23,582.78 in payroll costs, $94,000.00 in personal loans to the business, $84,586.39 in interest for loans made after June 1997, and $6,954.90 for interest paid on various personal credit cards for cash advances for the business.

[10] Dr. Kelsay's damage calculation was based on a comparison of the dealership's post-incident performance with its performance from 1994 through 1996, the three full calendar years immediately preceding the incident.

[11] These alternatives included: (1) comparing the dealership's total sales between June 1996 and November 1996 with its total sales during the comparable period in 1997; (2) comparing the sales of used vehicles between June 1996 and November 1996 with its used vehicle sales during the comparable period in 1997; (3) comparing the average monthly sales between December 1996 and May 1997 with the actual sales between June 1997 and November 1997; (4) comparing the average monthly total sales between July 1995 and May 1997 with the average total sales between June 1997 and May 1999; and (5) comparing the average net profit per business day for the twenty-nine-calendar-month period preceding the incident with the actual net profit per business day for a comparable period following the incident.

The trial court made its preliminary findings from the bench following the close of proof on September 24, 2001. First, it found that the church had breached its duty to oversee the painting of its new building and that this breach caused the overspray on Waggoner's vehicles. The court also concluded that the overspray was a "possible cause" of Chrysler's decision to reduce Waggoner's floor plan financing. Therefore, the trial court concluded that the church was liable for damages which included the cost of cleaning and reconditioning the damaged vehicles and the dealership's loss of income between June 1997 and 2000.[12]

However, the trial court expressed dissatisfaction with the veritable smorgasbord of damages calculations presented by the experts. It criticized Mr. Carpenter's conclusion that Waggoner had not been damaged after November 1997 and took him to task for failing to consider Waggoner's increased payroll expense caused by its decision to continue to pay its sales staff at pre-incident levels when there were fewer vehicles to sell. Likewise, the trial court criticized Dr. Kelsay's damages calculation because he had included 1995 as a base year in calculating the dealership's average profits for three years.[13]

Noting that it was required to "base a ruling on damages on proof that's before me and not on speculation," the trial court stated that it was "not satisfied with the analysis that I have" and concluded that it did not "have the proof in front of me" to calculate Waggoner's damages. Accordingly, the trial court instructed the parties to present additional evidence regarding the dealership's damages stemming from the decrease in floor plan financing, excluding any consideration of the dealership's 1995 sales. The trial court also instructed the parties to take into account the "six month downturn" immediately before the overspray incident occurred.[14]

When the trial resumed on January 12, 2002, both parties introduced additional evidence regarding Waggoner's lost profits damages. Dr. Kelsay presented two alternative calculations. His first alternative continued to use the three-year 1994-1996 base period. He insisted that 1995 should not be excluded from the analysis because doing so would "overstate" the dealership's losses in 1996.[15] Accordingly, using essentially the same methodology that he used during the September 24,

[12]The trial court never clearly explained how it decided that the damage period ended in 2000. It simply observed that the dealership's floor plan financing "was restored to essentially the same amount" at some point during 2001 and "[s]o we'll leave out 2001 and just stay with 2000." The record shows that Chrysler increased Waggoner's floor plan financing from $200,000 to $250,000 in May 1999 and to $350,000 in September 2001. As far as this record shows, Chrysler never restored Waggoner's floor plan financing to its pre-incident level.

[13]The trial court concluded that 1995 should not have been included because it unduly increased Waggoner's sales. The court decided that the 1995 sales were an aberration because they included the one-time sales of a newly introduced truck that proved to be extremely popular with customers and was in extremely short supply when it was first introduced.

[14]In addition, the trial court awarded Cincinnati Insurance Company $13,241.68 for the costs it incurred in cleaning the spray-damaged vehicles. It also awarded Waggoner $2,500 to reimburse it for the deductible payment on its insurance. These damages awards are not in dispute.

[15]In fact, Dr. Kelsay insisted that the dealership was "not in a state of decline in 1996" and that the reduced sales in 1996 were "simply a matter of economic timing differences." He explained that Waggoner's customers

(continued...)

2001 hearing, Dr. Kelsay determined that Waggoner's incremental loss of profits caused by the overspray incident was $432,208, or $532,614 when adjusted to reflect present value.[16]

Dr. Kelsay's second alternative embodied the analysis requested by the trial court at the end of the September 24, 2001 hearing. Using only 1994 and 1996 as the base years for the analysis, Dr. Kelsay determined that the dealership's incremental loss of profits was $297,929, or $342,278 when adjusted to reflect present value. Dr. Kelsay asserted that his calculations did not include any of the damages claimed by Mr. Waggoner.[17] Accordingly, Waggoner's evidence at the January 12, 2002 hearing placed its total damages in a range from $551,402.07 to $741,738.07.

The church did not present additional testimony by Mr. Carpenter. Instead, it presented the testimony of Richard W. Nokes, a certified public accountant who had performed between 200 and 250 valuations of automobile dealerships like Waggoner. Mr. Nokes provided a detailed critique of Dr. Kelsay's methodology and concluded that Waggoner's loss of profits attributable to the overspray incident were between $40,300 and $58,416.[18]

After hearing the additional evidence, the trial court observed that "the proof of the economic damages presented to the court is not totally satisfactory." The trial court reversed its decision to exclude 1995 sales from consideration and decided that the damages for lost profits should be based on a comparison of the dealership's performance from July 1994 through June 1997 with its performance from July 1997 through June 2000. Notwithstanding this conclusion, the court adopted Dr. Kelsay's second alternative based on a two-year average of 1994 and 1996 and concluded that Waggoner's lost profits attributable to the overspray incident were $342,278. The court determined that the $209,124.07 in additional damages sought by Mr. Waggoner were speculative.

Waggoner filed a Tenn. R. Civ. P. 59.04 motion requesting the trial court to increase the damages award. The basis for the motion was that Dr. Kelsay had responded too hastily to the trial court's questions regarding the base period and, as a result, had miscalculated the lost profits damages.[19] Attached to the motion was Dr. Kelsay's affidavit revising his estimate of Waggoner's lost profits damages under his second alternative from $342,278 to $400,091. Waggoner also

---

[15](...continued)
accelerated their purchases in 1994 and 1995 because of the popular new truck model and that these sales were at the expense of sales that would have occurred in 1996.

[16]The results of Dr. Kelsay's analysis in this first alternative differ from his earlier report and his September 24, 2001 testimony. We will address these differences later in this opinion.

[17]During cross-examination, Dr. Kelsay appeared to equivocate about including the $23,582.78 in commissions and the $94,000.00 in personal loans in the damages calculations.

[18]The difference in Mr. Nokes's alternatives is based on different emphasis being placed on the downward trend in retail sales occurring during the first six months of 1997. In his first alternative, Mr. Nokes assumed that this downward trend would continue during the second six months of 1997. In his second alternative, Mr. Nokes assumed that sales during the second six months of 1997 would be the same as sales during the first six months of 1997.

[19]In support of this claim, Waggoner argued that "hasty pie is often under baked."

conceded that it was not entitled to recover the unearned commissions paid during the last half of 1997 and, therefore, argued that the trial court's total damage award should be $585,632.29.[20] The church also filed a Tenn. R. Civ. P. 59.04 motion suggesting modifications in the wording of several portions of the trial court's order.

Following a hearing on April 1, 2002, the trial court entered an order on April 12, 2002 denying Waggoner's Tenn. R. Civ. P. 59.04 motion and granting the church's motion. The order awarded Waggoner $344,778 in damages[21] and $11,170 in discretionary costs. The church filed a timely notice of appeal. On appeal, the church asserts that the trial court erred by finding that it was liable for the damages caused by the paint overspray. It also takes issue with the amount of the damages award and with a portion of the award of discretionary costs. Waggoner also takes issue with the amount of the damages award.

## II.
### THE CHURCH'S LIABILITY FOR THE OVERSPRAY

At the outset, the church takes issue with the trial court's decision that it was liable for the overspray caused by Mr. Bare's spray painting on June 17, 1997. It relies on the general rule that the employer of an independent contractor is not liable for damages to third parties caused by the contractor's negligence. While Waggoner does not take issue with the church's characterization of Mr. Bare as an independent contractor, it insists that the church's conduct in this case brought it within several well-known exceptions to the general rule. We agree.

### A.
### An Employer's Liability for Negligence of an
### Independent Contractor

Tennessee, like many jurisdictions, recognizes the principle that the employer of an independent contractor is not automatically liable for physical harm caused to another by the contractor's negligence. *McHarge v. M. M. Newcomer & Co.*, 117 Tenn. 595, 604, 100 S.W. 700, 702 (1907); *Wilson v. Thompson Constr. Co.*, 86 S.W.3d 536, 541 (Tenn. Ct. App. 2001); Restatement (Second) of Torts § 409 (1965). The scope of this principle's application has been narrowed dramatically over the years by the recognition of numerous exceptions. *Givens v. Mullikin*, 75 S.W.3d 383, 394 (Tenn. 2002) (noting that the principle has many exceptions); *see also* Restatement (Second) of Torts §§ 410-429; W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 71, at 509-516 (5th ed. 1984). Indeed, it has been said that the principle is now so riddled with exceptions that it is only applied when the courts cannot find a good reason to ignore it. Restatement (Second) of Torts § 409 cmt. b.

---

[20]$400,091.00 [lost profits damages] + $185,541.29 [consequential damages] = $585,632.29.

[21]This amount included the $342,278 in lost profits damages and the $2,500 for the insurance deductible.

The facts of this case implicate four of the Restatement (Second) of Torts's exceptions to the principle of the employer's non-liability for the negligence of an independent contractor.[22] First, Restatement (Second) of Torts § 410 provides that "[t]he employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself." The Tennessee Supreme Court has recognized this exception as the chief exception to the non-liability principle. *Givens v. Mullikin*, 75 S.W.3d at 394. Employers are not liable under this section if they neither knew nor should have known that the work involved an unreasonable risk of harm to others when they gave their orders or instructions. However, an employer will be liable if, having been informed of a risk that the contractor has discovered, it requires the contractor to carry out its original orders or instructions. Restatement (Second) of Torts § 410 cmt. c.

Second, Restatement (Second) of Torts § 414 provides as follows:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Our courts have recognized this exception implicitly by emphasizing the central importance of the right to control when determining whether a person is an employee or independent contractor.[23] This exception usually applies to general contractors who have entrusted part of their work to subcontractors but who superintend the entire job. Restatement (Second) of Torts § 414 cmt. b. For this exception to apply, the employer must have retained sufficient control that the independent contractor is not entirely free to perform the work in his or her own way. Restatement (Second) of Torts § 414 cmt. c.

Third, Restatement (Second) of Torts § 414A provides:

> A possessor of land who has employed or permitted an independent contractor to do work on the land, and knows or has reason to know that the activities of the contractor or conditions created by him involve an unreasonable risk of physical harm to those outside of the land, is subject to liability to them for such harm if he fails to exercise reasonable care to protect them against it.

---

[22]The Restatement (Second) of Torts lists numerous exceptions to the non-liability principle, grouping them into three broad categories: (1) exceptions based on the employer's negligence in selecting, instructing, or supervising the independent contractor, (2) exceptions based on non-delegable duties the employer owes to the public in general or to the plaintiff in particular, and (3) exceptions based on work that is specifically, peculiarly, or inherently dangerous. RESTATEMENT (SECOND) OF TORTS § 409 cmt. b.

[23]*Gulf Ref. Co. of la. v. Huffman & Weakley*, 155 Tenn. 580, 585-88, 297 S.W. 199, 200-201 (1927); *Howell v. Shepherd*, 29 Tenn. App. 375, 382-83, 196 S.W.2d 849, 852 (1945).

This exception applies whenever the independent contractor's activities involve an unreasonable risk of harm to persons outside the employer's property. Restatement (Second) of Torts § 414A cmt. a. Employers may reasonably assume that a competent contractor is performing the work properly until they have reason to know the contrary. However, an employer will be liable if it knows or has reason to know that the contractor is engaging in or about to engage in an activity which under the circumstances, will involve an unreasonable risk of harm to others outside the owner's property. Restatement (Second) of Torts § 414A cmt. b.

Finally, Restatement (Second) of Torts § 427 provides:

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

The exception applies when the contractor is performing work that involves risk, recognizable in advance, of physical harm to others that is inherent in the work itself or in the usual or prescribed way of doing the work. Restatement (Second) of Torts § 427 cmt. b; *see also Powell v. Construction Co.*, 88 Tenn. 692, 697, 13 S.W. 691, 692 (1890); *Potter v. Tucker*, 688 S.W.2d 833, 836 (Tenn. Ct. App. 1985). The risk must be one that should be reasonably anticipated at the time of the contract. Restatement (Second) of Torts cmt. d; *McHarge v. M. M. Newcomer & Co.*, 117 Tenn. at 612-13, 100 S.W. at 704 (noting that the risks must be ones that should be reasonably anticipated).

It is clear from several of the illustrations provided by the Restatement (Second) of Torts that this exception is not limited to work that is abnormally dangerous or that carries with it a high degree of risk of harm to others. For example:

> A employs B, an independent contractor, to paint the wall of his building above the public sidewalk. In the course of the work a workman employed by B drops his paint bucket, which falls upon C, a pedestrian, and injures him. The danger is inherent in the work, and A is subject to liability to C.

Restatement (Second) of Torts § 427 cmt. d, illus. 1.[24] Similarly:

> A employs B, an independent contractor, to build a wall on A's land. While the wall is under construction B's workmen negligently splash

---

[24]*See also* Restatement (Second) of Torts § 426 cmt. b, illus. 3. The Restatement observes that "the use of a scaffold in painting the wall of a building above a sidewalk involves a recognizable risk that the scaffold, paint brush or bucket, or the painter himself, may fall and injure someone passing below." Restatement (Second) of Torts § 427 cmt. c.

> mortar over C's adjoining windows and the clothes in her yard. A is subject to liability to C.

Restatement (Second) of Torts § 426 cmt. b, illus. 5.

Thus, the exception will apply to any work which, although not highly dangerous, involves a risk recognizable in advance that danger inherent in the work itself, or in the ordinary or prescribed way of doing it, may cause harm to others. Restatement (Second) of Torts, § 427 cmt. c.[25]

## B.
## The Conduct of the Church and its Painter

The three persons involved in the painting at the church have different memories of the events on the morning of June 17, 1997. Mr. Bare testified that he telephoned Richard Ostling, the church's construction supervisor, during the evening on June 16, 1997 to express his concern about the spray painting planned for the next day because of the rain and the wind blowing in the wrong direction. According to Mr. Bare, Mr. Ostling responded: "Get it [the scissor lift] down here because I should have done had this done a month or two months before." Mr. Bare also testified that when he arrived at the job site on the morning of June 17, 1997, he warned Mr. Ostling as follows:

> We are probably going to wear those cars out . . . the ones out down at the Ford [d]ealership, too. Probably every car in this town that comes through here. It is not a good day to be doing it. Need to wait for a north wind, you know, that would help. It would carry it all right up the hill away from everybody and everything. . . . Matter of fact, why don't you just block this building up. Just wait, block it up, let me bring the lift in here and you won't have no problems with nobody.

However, according to Mr. Bare, Mr. Ostling consulted with Marvin Spann, the church elder responsible for the project, and then instructed him to begin spray painting.

By Mr. Bare's account, later, when the wind "started blowing very bad toward the car lot," Mr. Ostling decided to put up some tarpaulins to catch the overspray. In response to Mr. Bare's concern that the tarpaulins were not staying up, Mr. Ostling allegedly told him, "Look, it is raining.

---

[25]The exception does not apply, however, when the contractor's collateral negligence creates a new risk that is not inherent in the work itself or in the usual and prescribed way of doing the work. Restatement (Second) of Torts § 427 cmt. d. The Restatement (Second) of Torts provides the following illustration:

> A employs B, an independent contractor, to paint the wall of his building above the public sidewalk. B erects his scaffolding at a level so low that C, a pedestrian walking along the sidewalk in the dark, runs his head against the corner of the scaffold and is injured. This is collateral negligence, and A is not liable to C.

Restatement (Second) of Torts § 427 cmt. d, illus. 2.

It's wet. Besides, calm down. Don't panic. You worry too much, son. Don't worry. . . That is what insurance is for."

Mr. Bare testified that even after Waggoner's representatives complained about the overspray on the afternoon of June 17, 1997, Mr. Ostling wanted to continue painting, saying, "[w]ell, we have already done damage. We can't do no more damage than we have already done." According to Mr. Bare, he responded, "Bull crap. We can do a heck of a lot more damage than we have already done." Mr. Bare asserted that it was at this point that Mr. Spann agreed with him that no more painting should be done that day.

The next morning, Mr. Waggoner met with Mr. Spann at the dealership to discuss the overspray damage. According to Mr. Waggoner, Mr. Spann told him that he, Mr. Ostling, and Mr. Bare had been concerned about the wind and had even discussed whether they should begin painting. Mr. Waggoner testified that Mr. Spann admitted that they had eventually decided to begin painting anyway, and conceded that "[w]e've done a lot of damage."

Mr. Spann's and Mr. Ostling's memories of June 17, 1997 were not as good as Mr. Bare's. While Mr. Spann conceded that he worked on the construction schedule with Mr. Ostling and that he was at the job site that morning, he insisted that he had no conversations with either Mr. Ostling or Mr. Bare regarding whether the weather conditions were appropriate for spray painting. He also stated that he was not privy to any conversations Mr. Ostling and Mr. Bare may have had regarding the weather conditions. Mr. Ostling testified that he could not remember the specifics of his conversations with Mr. Bare, but he denied telling Mr. Bare that he had to begin painting that day or telling him "that is what insurance is for."

## C.
## The Church's Liability for the Conduct of its Painter

In this case, the church is both a landowner and a general contractor. As a general contractor, it retained authority to superintend the entire construction job, including when the work on the different parts of the project would be performed. The church was exercising this authority directly through its construction supervisor on the morning of June 17, 1997.

Overspray is a well-known risk inherent in spray painting.[26] The risk of damage to surrounding property caused by overspray is unreasonable because the probability and gravity of the damage far outweighs the burden on persons engaged in spray painting to take proper precautions to prevent the damage.[27]

---

[26]*Benesh v. New Era, Inc.*, 566 N.E.2d 779, 782 (Ill. App. Ct. 1991) (noting that paint overspray is a relatively common occurrence).

[27]The Tennessee Supreme Court has noted that a risk becomes unreasonable if the reasonably foreseeable probability and gravity of the harm outweigh the burden upon the defendant to engage in alternative conduct that would have prevented the harm. *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

The risk of overspray should have been known by the church when it contracted with Mr. Bare to spray paint the steel beams on its new building. Even if the church, for some reason, was unaware that spray painting had an inherent risk of overspray, it had actual knowledge of the overspray problem on June 17, 1997 when Mr. Bare expressed his concern about spray painting because of the wind conditions. Despite Mr. Bare's warnings, the church and its construction supervisor instructed Mr. Bare to begin spray painting, [28] and the construction manager insisted that the spray painting continue even after the wind blew down several of the tarpaulins that had been erected to minimize the dispersion of the overspray by the wind.

Based on these facts, the church either knew or had reason to know that spray painting, even when properly performed, carried with it a risk of overspray that could damage other's property. Because the church was both the property owner and its own general contractor, it retained sufficient control over the project to decide when the various parts of the work, including the spray painting, would be carried out. Based on its actual and imputed knowledge of the potential overspray problems, particularly the problems resulting from the windy conditions on June 17, 1997, the church acted negligently by insisting that Mr. Bare spray paint the steel beams after he expressed his concern about the effect the wind would have on the overspray. Accordingly, the trial court properly concluded that the church was liable not only for the damage to the vehicles parked on Waggoner's parking lot, but also for damages to Waggoner's business resulting from the overspray.

## III.
### THE EVIDENCE OF THE DAMAGE TO WAGGONER'S BUSINESS

The church also takes issue on appeal with the trial court's decision to award Waggoner $342,278 in lost profits damages. Specifically, it insists that the dealership was not entitled to damages for lost profits because it was not a profitable business at the time of the overspray incident. Second, it asserts that the manner in which the dealership's economist calculated lost profits is so flawed that the damages award must be based on sheer speculation and conjecture. Like the trial court, we find many shortcomings in the lost profits evidence submitted by both parties. After examining with considerable care both the testimony of the parties' experts and the dealership's records, we find that the evidence preponderates against the trial court's decision that Waggoner lost $342,278 in reasonably expected profits as a result of the overspray incident. We have, however, determined that the evidence in the record, such as it is, supports awarding Waggoner $83,192 in lost profits.

### A.
### General Damages Principles

The purpose of compensatory damages is to compensate a party for the loss or injury caused by a wrongdoer's conduct. *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975);

---

[28] Despite Mr. Spann's efforts at trial to distance himself from Mr. Ostling, Mr. Waggoner's testimony regarding his conversation with Mr. Spann on June 18, 1997 provides a sound factual basis for concluding that Mr. Spann was aware of Mr. Bare's concerns and participated in the decision to spray paint on the morning of June 17, 1997 despite them. Mr. Waggoner testified that Mr. Spann told him that "we had a conversation before the painting was done about whether we should do it or not."

*Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). The goal is to restore the injured party, as nearly as possible, to the position the party would have been in had the wrongful conduct not occurred. *Beaty v. McGraw*, 15 S.W.3d 819, 828-29 (Tenn. Ct. App. 1998). The injured party should be fully compensated for all losses caused by the wrongdoer's conduct. *General Constr. Contractors Ass'n, Inc. v. Greater St. Thomas Baptist Church*, 107 S.W.3d 513, 526 (Tenn. Ct. App. 2002).

The party seeking damages has the burden of proving them. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 272 (Tenn. Ct. App. 1982). While there is no mathematical formula for calculating damages in negligence cases, *Brown v. Chesor*, 6 S.W.3d 479, 483 (Tenn. Ct. App. 1999), the proof of damages must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the claimed damages. *Provident Life & Accident Ins. Co. v. Globe Indem. Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057, 1058 (1928); *Pinson & Assocs. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990).

Damages may never be based on speculation or conjecture. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d at 703; *Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 335-36 (Tenn. Ct. App. 1987). However, damages become too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain. *Church v. Perales*, 39 S.W.3d 149, 172 (Tenn. Ct. App. 2000). The evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty. *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 595 (Tenn. Ct. App. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d at 703.

**B.**
**Principles Applicable to Lost Profits Damages**

Injured parties seeking to recover damages for lost anticipated profits have traditionally faced an uphill climb. The traditional rule was that anticipated damages of a commercial business are too speculative and dependent on changing circumstances to warrant a judgment for their loss. *Chisholm & Moore Mfg. Co. v. United States Canopy Co.*, 111 Tenn. 202, 209-10, 77 S.W. 1062, 1063 (1903); *General Constr. Contractors Ass'n, Inc. v. Greater St. Thomas Baptist Church*, 107 S.W.3d at 525. Now, however, the courts recognize that an injured party may recover lost anticipated profits when their nature and occurrence have been established with reasonable certainty. *Baker v. Hooper*, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001); *Tire Shredders, Inc. v. ERM-North Cent., Inc.*, 15 S.W.3d 849, 857 (Tenn. Ct. App. 1999); 1 *Recovery of Damages for Lost Profits* § 1.4, at 9.

The reasonable certainty standard applies chiefly to the evidence regarding the existence of damages. 1 *Recovery of Damages for Lost Profits* § 1.6, at 17. It is a flexible standard that permits the courts to take the particular facts of each case into consideration. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). The existence of damages has been proven with reasonable certainty when the mind of a prudently impartial person is satisfied that the injured party has been damaged. *Brevard County Fair Ass'n, Inc. v. Cocoa Expo, Inc.*, 832 So.2d 147, 153 (Fla. Dist. Ct. App. 2002); *Welch v. U.S. Bancorp Realty & Mortgage Trust*, 596 P.2d 947, 963 (Or. 1979).

Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision. *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 200 (Tenn. Ct. App. 1990); *see also Authentic Architectural Millworks, Inc. v. SCM Group USA, Inc.*, 586 S.E.2d 726, 731 (Ga. Ct. App. 2003). After the fact of damages had been established, less certainty is required with regard to the amount of the damages. The amount of lost profits damages may be based on estimates. *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003); *Sostchin v. Doll Enters., Inc.*, 847 So.2d 1123, 1128 (Fla. Dist. Ct. App. 2003). While definite proof regarding the amount of damages is desirable as far as it is reasonably possible,[29] it is even more desirable that an injured party not be deprived of compensation merely because it cannot prove the extent of the harm suffered with complete certainty. Restatement (Second) of Torts § 912 cmt. a (1979). This principle is based on the policy that defendants should not be permitted to complain about the lack of exactness or precision in the proof regarding the amount of damages when their wrongdoing created the damages in the first place. *Walgreen Co. v. Walton*, 16 Tenn. App. 213, 223, 64 S.W.2d 44, 50 (1932); 1 *Recovery of Damages for Lost Profits* § 5.2, at 385.

An award for lost profits damages depends on whether the evidence provides a satisfactory basis for estimating what the injured party's probable earnings and expenses would have been had the wrongdoing not occurred. *Kids' Universe v. In2Labs*, 116 Cal. Rptr. 2d 158, 168 (Ct. App. 2002). Since lost profits can rarely be computed down to the last penny, 1 *Recovery of Damages for Lost Profits* § 5.1, at 382, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been. 1 *Recovery of Damages for Lost Profits* § 5.5, at 391.

Anticipated future profits may be reasonably ascertained from the past volume of the injured party's business and from other provable data relevant to probable future sales. *Kids' Universe v. In2Labs*, 116 Cal. Rptr. 2d at 168. The best evidence of lost profits is a comparison of the experience of the injured party's own business before and after the wrongdoing. *Swierczynski v. Arnold Foods Co.*, 265 F. Supp. 2d 802, 811 (E.D. Mich. 2003); *KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1265, 1269 (M.D. Ala. 2001); *Walgreen Co. v. Walton*, 16 Tenn. App. at 222; 64 S.W.2d at 49 (approving the comparison approach but disapproving the length of the post-wrongdoing period); 1 *Recovery of Damages for Lost Profits* § 5.7, at 396.

Damages for lost profits must be based on net profits, not on gross revenues or on gross profits.[30] In cases involving the loss of expected profits from the sale of goods, the expected net profits equals the expected revenue from the sale of the goods minus the cost of the goods sold

---

[29] Parties seeking to recover lost profits damages would be well advised to provide the best available proof as to the amount of their loss that the particular situation permits. *Vickers v. Wichita State Univ.*, 518 P.2d 512, 517 (Kan. 1974).

[30] *American Bldgs. Co. v. DBH Attachments, Inc.*, 676 S.W.2d 558, 563 (Tenn. Ct. App. 1984) (lost profit damages cannot be based on gross profits); *Joy Floral Co. v. South Cent. Bell Tel. Co.*, 563 S.W.2d 190, 192 (Tenn. Ct. App. 1977) (same). This court has defined gross profits as the revenue derived from the sale of goods minus the cost to the seller of those goods. *Forklift Sys., Inc. v. Werner Enters.*, No. 01A01-9804-CH-00220, 1999 WL 326159, at *1 (Tenn. Ct. App. May 25, 1999) (No Tenn. R. App. P. 11 application filed).

minus all of the seller's expenses fairly attributable to the sale of the goods.[31] *First Tenn. Bank, Nat'l Ass'n v. Hurd Lock & Mfg. Co.,* No. 117, 1988 WL 86493, at *3 (Tenn. Ct. App. Aug. 19, 1988), *perm. app. denied* (Tenn. Oct. 31, 1988) (defining net profits as gross profits minus the "costs necessary to achieve those gross profits"); *Tri-Fuels, Inc. v. Automotive Franchise Corp.*, No. 87-180-II, 1987 WL 18967, at *9 (Tenn. Ct. App. Oct. 30, 1987) (No Tenn. R. App. P. 11 application filed) (holding that "net profit" means gross profit minus "administrative costs including selling expenses, which are 'overhead'"). Thus, persons seeking to recover for lost expected profits must prove not only the probable income from the sale of the goods but also the expenses they would have incurred to produce that income. *Authentic Architectural Millworks, Inc. v. SCM Group USA, Inc.*, 586 S.E.2d at 731.

## C.
### Waggoner's History of Profitability

We turn first to the church's argument that Waggoner is not entitled to damages for its lost anticipated profits because the company was not profitable at the time of the overspray incident. Put more plainly, the church asserts that a business cannot recover lost profits if it had no profits to lose. Tennessee's courts have never squarely addressed this argument. Although there is some support for it in other jurisdictions, we have determined that the better rule permits businesses, even businesses of marginal profitability, to recover for demonstrable financial injury.

Defenses predicated on the assertion that the plaintiff cannot prove a history of profitability have frequently been rejected by the courts. Generally, the courts hold that an injured party is not required to prove a history of profitability to be entitled to recover lost anticipated profits. *See, e.g., Beverly Hills Concepts, Inc., v. Schatz & Schatz, Ribicoff & Kothin,* 717 A.2d 724, 739 (Conn. 1998); *Sostchin v. Doll Enters., Inc.*, 847 So. 2d at 1128; *North Dade Cmty. Dev. Corp. v. Dinner's Place, Inc.*, 827 So. 2d 352, 353 (Fla. Dist. Ct. App. 2002); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 505 (Tex. 2001); *Capital Metro. Transp. Auth./Cent. of Tenn. Ry. & Navigation Co. v. Central of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 579 (Tex. App. 2003). Courts recognize that a commercial enterprise can suffer economic injury regardless of its financial starting point. As one court has noted, "simply because a business may have a net loss does not mean that it cannot suffer *further* damage at the hands of another." *Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 258 (Tex. App. 1987); *see also* 1 *Recovery of Damages for Lost Profits* § 4.10, at 370 (noting that an injured party could have lost less had the wrongdoing not occurred).

To hold otherwise would produce a particularly egregious result in cases like this one in which the injured party is hovering around the break-even point. Were we to follow the church's logic, Waggoner could recover if the overspray occurred during one of its good years but not if the injury occurred during one of its down years. A common sense reading of the law cannot sustain this position. Accordingly, having determined that Waggoner presented sufficient proof to establish that

---

[31]Fixed overhead expenses, *i.e.*, expenses that the injured party would have incurred notwithstanding the wrongful act, should not be deducted from gross revenue. *Interstate Oil & Supply Co. v. Troutman Oil Co.*, 972 S.W.2d 941, 944 (Ark. 1998); 1 *Recovery of Damages for Lost Profits* § 6.5, at 443-44. By the same token, the injured party cannot deduct anticipated expenses that it did not incur as a result of the wrongful act. *Petty v. Weyerhaeuser Co.*, 342 S.E.2d 611, 616 (S.C. Ct. App. 1986).

its business was damaged as a direct result of the paint overspray, we now turn to Waggoner's evidence concerning the amount of these damages.

## D.
## Waggoner's Expert Evidence Regarding Lost Profits

Waggoner's evidence on the issue of its lost profits consists solely of Dr. Kelsay's expert opinion regarding what Waggoner's profits would have been had the 1997 overspray incident not occurred. Despite its conclusion that Dr. Kelsay's testimony was "not totally satisfactory," the trial court based its award of lost profits damages on Dr. Kelsay's revised projections. We concur with the trial court's conclusion that Dr. Kelsay's testimony is not satisfactory, and we find that his methodology is so flawed that basing an award of lost profits on his projections is little more than speculation.

## 1.
## Use of Expert Testimony to Establish Lost Profits

The existence and amount of lost profits damages may be established by expert testimony.[32] *See, e.g., M-S-R Pub. Power Agency v. Tucson Elec. Power Co.*, 742 F. Supp. 1058, 1059 (D. Ariz. 1990); *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 640 (Ohio 1990); *Global Pro. Corp. v. Halbersberg*, 503 S.E.2d 483, 487 (S.C. Ct. App. 1998); *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1166 n.4 (Utah 1983). Accountants and economists are commonly retained to provide expert opinions regarding a business's lost profits, 2 *Recovery of Damages for Lost Profits* §§ 7.5, to 7.6, at 541-45, and courts have relied on their testimony to calculate lost profits damages.

Expert opinions or estimates of lost expected profits must be based on objective facts, figures, or data from which the amount of lost profits may be reasonably ascertained. *Long v. Langley*, No. W2001-01490-COA-R3-CV, 2002 WL 818224, at *7 (Tenn. Ct. App. Apr. 23, 2002) (No Tenn. R. App. P. 11 application filed); *SBC Operations, Inc. v. Business Equation, Inc.*, 75 S.W.3d 462, 467 (Tex. App. 2001); Neil P. Cohen et al., *Tennessee Law of Evidence* § 7.02[12] (4th ed. 2000). In addition, the expert must employ recognized and acceptable methodology and must apply the methodology in a proper manner. If an expert relies on unreliable foundational data, any opinion drawn from that data is likewise unreliable. By the same token, an expert's testimony is unreliable, even when the underlying data is sound, if the expert employed flawed methodology[33] or applied sound methodology in a flawed way.[34]

---

[32]However, in many circumstances, lost profits may also be established without presenting expert testimony. *See, e.g., Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 269 (Minn. 1980); *Rocky Mountain Enters., Inc. v. Pierce Flooring*, 951 P.2d 1326, 1331-32 (Mont. 1997); *Southwestern Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 499 (Tex. App. 1992).

[33]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153, 119 S. Ct. 1167, 1176-77 (1999); *Gilbert v. DaimlerChrysler Corp.*, ___ N.W.2d ___, ___, 2004 WL 1632857, at *13 (Mich. July 22, 2004); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d at 499.

[34]*Zimmerman v. Powell*, 684 N.W.2d 1, 7 (Neb. 2004).

**2.**
**The Adequacy of Dr. Kelsay's Testimony**

Despite Waggoner's assertion that an economist's calculation of its loss of expected profits is superior to that of an accountant, Dr. Kelsay's methodology consisted of simply compiling information from Waggoner's financial statements. It required no economic expertise to comprehend. Dr. Kelsay claims to have examined a vast array of economic data in determining that the downturn in Waggoner's sales in 1996 was caused by the upsurge in truck sales in 1995. However, little of this data is included in the record, and Dr. Kelsay made no effort to correlate Waggoner's past performance with these broader economic trends. Consequently, the lost profits projections Dr. Kelsay offered in this case may be viewed as based on little more than an ordinary examination of Waggoner's financial statements.

We have taken considerable care to examine Dr. Kelsay's testimony to determine whether he has reasonably assessed Waggoner's lost profits. Our conclusion is that Dr. Kelsay's methodology is flawed in numerous material respects and that these flaws undermine the reliability of his conclusions. The following is a summary of the most glaring problems with Dr. Kelsay's analysis:

(1)     The evidence does not support Dr. Kelsay's conclusion that the sales down-turn in 1996 was caused by consumers' rush in 1995 to purchase trucks with a new body style. According to Waggoner's records, truck sales in 1995 decreased by over 20% from the previous year, and the increase in overall sales in 1995 was attributable to an increase in used car sales.

(2)     By using the calendar years of 1994, 1995, and 1996 as the base period for Waggoner's performance instead of the thirty-six months immediately preceding the overspray incident, Dr. Kelsay undervalued the downward trend in Waggoner's overall performance during the preceding eighteen months. Even though the unit sales during the first five months of 1997 were the worst in Waggoner's history, Dr. Kelsay's model predicted a substantial increase in sales during the second half of 1997 and thereafter. The evidence does not support this conclusion.

(3)     Instead of comparing Waggoner's actual net profit following the overspray incident with its projected net profit, Dr. Kelsay projected Waggoner's lost profits based on the number of vehicles sold multiplied by the average gross profit per unit for the 1994, 1995, and 1996 calendar years. This approach is inconsistent with the requirement that lost profits be based on net profits, and by our calculations, it inflated Waggoner's lost profits by $186,728.

(4)     Although Dr. Kelsay's presentation on the first day of trial and the first alternative he presented on the second day of trial were purportedly based on the same set of assumptions, there are numerous unexplained differences in the two sets of figures, including, but not limited to, the service and parts figures and the unit sales for 2000.

(5)     There appear to be numerous discrepancies in the figures contained in Table 6 of Dr. Kelsay's report.  For instance, the loss in gross profits on new car sales in 1997 is stated to be $72,509.  Yet, when we multiply the loss in unit sales (49) by the average gross profit for new  cars ($1,490), the result is $73,010.  Similar discrepancies appear in the calculations for other years.

(6)     Dr. Kelsay concludes that Waggoner lost $7,564 on parts and service but offers little to explain how the purported loss occurred.  Our analysis of Waggoner's financial records indicates that service income in 1997 was nearly identical to that in 1996 and that parts sales in 1997 were the highest in the company's history.  Income in these two areas has grown steadily since then.  Accordingly, Dr. Kelsay's conclusion regarding losses in parts and service is not supported by the evidence.

(7)     It does not appear that Dr. Kelsay considered all of Waggoner's variable expenses properly attributable to the sale of vehicles.  Because lost profits damages must take all the expenses into consideration, Dr. Kelsay's approach is not consistent with Tennessee law.  Our efforts to replicate Dr. Kelsay's variable expense figures have proved futile.  However, because of the other material shortcomings in Dr. Kelsay's methodology, we have not pursued this issue to its conclusion.

(8)     While there appears to be a relationship between the overspray incident and the reduction in Waggoner's floor plan, Dr. Kelsay's testimony offers little insight into the mechanics of that relationship or its effects on the on-going profitability of the dealership.  Accordingly, this aspect of Waggoner's injury remains remote and speculative.

Waggoner's financial records provided an appropriate basis for calculating its anticipated future profits.[35]  However, we have determined that Dr. Kelsay's analysis of these records is so flawed that his conclusions are tantamount to speculation about what Waggoner's profits might have been had the overspray incident not occurred.  Therefore, the trial court erred by basing its calculation of Waggoner's lost profits damages on Dr. Kelsay's testimony.[36]

---

[35]We disagree with the church's assertion that Waggoner's tax returns are somehow superior to its other financial records.

[36]Our conclusion that Dr. Kelsay's testimony was too speculative to provide a basis for awarding lost profits damages disposes of Waggoner's assertion that the trial court erred by failing to base its calculation of lost profits on the first alternative Dr. Kelsay presented on the second day of trial.  The shortcomings in Dr. Kelsay's testimony undermine the validity of both of the alternatives he presented on the second day of trial.  Therefore, the trial court did not err by declining to base its award for lost profits on Dr. Kelsay's first alternative.

## E.
## Mr. Waggoner's Testimony Regarding Damages

The trial court also declined to award Waggoner damages based on Mr. Waggoner's four-pronged estimate of consequential damages resulting from the overspray incident.[37] The correctness of the trial court's decision is beyond the scope of this appeal because Waggoner has not taken issue with it. While several of these expenses had already been factored into Dr. Kelsay's calculations,[38] there are independent reasons for declining to base an award of damages on them. The sales staff's commissions were based on sales during the first half of the year despite the testimony that sales during the second half of the year traditionally lagged behind the sales during the first half. The claimed interest expenses do not differentiate between the interest that the dealership would have paid because of its customary borrowing and the interest it paid on loans necessitated by the overspray incident.[39] Finally, the $94,000 in additional funds that Mr. Waggoner put into the business following June 1997 ignores the evidence that Chrysler had been requiring additional capital infusions into the dealership before the overspray incident and that further capital infusions would have been required in light of Chrysler's concerns about the dealership's sales performance.

## IV.
### AN ALTERNATIVE DAMAGE AWARD UNDER TENN. R. APP. P. 13(d)

Any award of lost profits damages based on the testimony of Mr. Waggoner or Dr. Kelsay would be speculative. Accordingly, if the only evidence of Waggoner's lost profits consisted of Mr. Waggoner's and Dr. Kelsay's testimony, we would have no alternative other than to conclude that Waggoner was not entitled to damages even though it had not presented adequate evidence that its business had been damaged by the June 1997 paint overspray incident. However, the record contains other evidence regarding Waggoner's lost profits – the testimony offered by the church's expert accountants. This court may consider this evidence to determine whether it supports another damages award.

The church's accountants presented convincing evidence of the overspray incident's short-term impact on Waggoner's profits. They pointed out that all of the damaged vehicles were reconditioned and sold by the end of 1997 and that Waggoner's total sales in 1998 surpassed its 1996 sales by a substantial margin. Based on this evidence, it is reasonably certain that the overspray

---

[37]Mr. Waggoner has testified that the dealership lost an additional $209,124.07 as a result of the overspray incident – $23,582.78 in unearned commissions, $94,000.00 in personal loans to the business, $84,586.39 in interest on loans made after June 1997, and $6,954.90 in interest on cash advances on Mr. Waggoner's credit cards.

[38]The courts should guard against double recoveries in claims for lost damages. 2 *Recovery of Damages for Lost Profits* § 7.27A, at 232-36 (Supp. 2004). Presumably, Dr. Kelsay's calculations accounted for sales commissions and interest expenses.

[39]Mr. Waggoner had been lending the dealership considerable sums of money since its inception. In addition, the proceeds of the loans made after June 1997 were used to replace funds no longer available because of the reduction in the dealership's floor plan financing. Waggoner is not entitled to claim the entire interest expense as damages. If anything, it would have been entitled to the difference between the total additional interest expense and the interest it would have paid under its original floor plan financing.

incident affected Waggoner's profits for the remainder of 1997 following the overspray incident but no longer. Thus, we focus our inquiry on Waggoner's profitability during the last half of 1997.

Predicting Waggoner's performance during the second half of 1997 should ideally take into consideration the seasonal cycles in its business. Mr. Nokes's first approach does this most straightforwardly. This approach is also premised on two of the most modest and straightforward assumptions of any offered during this trial – that Waggoner's sales are typically slightly higher in the first half of the year, and that Waggoner's first-half sales are the best predictor of its second-half sales. By combining an emphasis on immediate past performance with a historical perspective, Mr. Nokes's methodology provides a simple and reasonable prediction of short-term profits.

We find several shortcomings in Mr. Nokes's approach that require some adjustments. First, he based his calculations on the assumption that Waggoner's sales during the first half of the year account for 61% of its total sales for the year. While this was the correct figure for new vehicle sales in 1996, the figures for new vehicle sales for 1994 and 1995 were much lower. The same is true for the used vehicle sales for those years. By ignoring the figures from earlier years and using only the 61% figure, Mr. Nokes minimized Waggoner's projected sales during the second half of 1997. He should have based his calculations on a three-year average. Therefore, we have determined that Mr. Nokes should have used the figure of 56% for the sale of new vehicles and 55% for the sale of used vehicles.[40]

Second, we have determined that Mr. Nokes should not have included lost profits from parts and service in his calculations. As we have already noted, we find no evidence in the record that the profits from the sale of parts and services varies in any manner consistent with the sale of vehicles. Parts sales in 1997 were the highest in Waggoner's history in spite of the downturn in vehicle sales. The calculation of a loss in this area is unsupported by the facts and does not appear to be based on any real conviction on Mr. Nokes's part that a loss actually occurred.

Finally, we note that Mr. Nokes deducted only the sales commissions to determine Waggoner's net profits. He was correct in doing so because commissions would have increased had Waggoner achieved the projected sales. However, Mr. Nokes, like Dr. Kelsay, did not address the dealership's other expenses that vary with sales. Had he done so, his figures would have reflected a more accurate net profit figure. We cannot make adjustments for this oversight because the record does not contain specific evidence of these variable expenses. However, we will overlook this oversight because it works to the detriment of the church rather than Waggoner. The church offered Mr. Nokes's testimony and is in no position now to dispute it.

---

[40]Waggoner's records show that its new vehicle sales during the first half of 1994 accounted for 52% of its sales for the year. The 1995 figure was 56%, and the figure in 1996 was 61%. The three-year average for the sales of new vehicles is 56%. Similarly, Waggoner's records show that used vehicle sales for the first half of 1994 accounted for 50% of its sales for the year. The 1995 figure was 54%, and the figure in 1996 was 60%. Thus, the three-year average for used vehicle sales is 55%.

After making the two adjustments discussed above, we have determined that Waggoner's lost profits on the sale of new vehicles attributable to the paint overspray amount to $38,476[41] and that the lost profits on the sale of used vehicles amount to $16,206.[42] Thus, Waggoner's total lost profits stemming from the overspray incident are $54,682. Since Mr. Nokes did not include interest on these damages, we adopt Dr. Kelsay's approach of using the average prime rate for the period from the time the loss occurred. For the years from 1998 through June 30, 2004, we calculate that rate to be 6.6%; therefore, Waggoner is entitled to an award of interest in the amount of $28,510. Accordingly, we modify the amount of lost profits damages awarded to Waggoner from $342,278 to $83,192. When this amount is added to the $2,500 judgment for Waggoner's insurance deductible, the total amount of the judgment is reduced from $344,778 to $85,692.

## V.
### THE AWARD OF DISCRETIONARY COSTS

Finally, the church takes issue with a portion of the $11,170 award for discretionary costs. It asserts that Waggoner was not entitled to recover Dr. Kelsay's $2,668.75 fee for preparing the revised report and affidavit that supported Waggoner's unsuccessful Tenn. R. Civ. P. 59.04 motion. Waggoner responds that it is entitled to be reimbursed for this expense because the trial court determined that Dr. Kelsay's method of calculating lost profits damages was the "best approach." We have determined that Waggoner is not entitled to recover this fee, not because its motion was unsuccessful, but because fees of this type are not included in Tenn. R. Civ. P. 54.04(2).

A party is not automatically entitled to an award of discretionary costs under Tenn. R. Civ. P. 54.04(2) simply because it prevailed in the litigation. *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 84 (Tenn. Ct. App. 2000). It has the burden of convincing the trial court that it is entitled to these costs. *Stalsworth v. Grummons*, 36 S.W.3d 832, 835 (Tenn. Ct. App. 2000). A party seeking discretionary costs can carry its burden by filing a timely, properly supported motion demonstrating (1) that it is the prevailing party, (2) that the costs being sought are included in Tenn. R. Civ. P. 54.04(2), (3) that the costs are necessary and reasonable, and (4) that it has not engaged in conduct during the litigation that justifies depriving it of the costs it is requesting. *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35-36 (Tenn. Ct. App. 2002).

Waggoner has demonstrated that it is the prevailing party, that its requested costs were necessary and reasonable, and that it did not engage in inappropriate conduct during the litigation. The pivotal question is whether Dr. Kelsay's fee for the preparation of the supplemental report and affidavit supporting Waggoner's motion for new trial is one of the costs included in Tenn. R. Civ. P. 54.04(2). We have concluded that it is not.

---

[41]$135,114 ÷ 56% = $241,275 in projected revenue from the sale of new vehicles in 1997. The lost profits on these sales is $42,839 - $4,363 [additional sales expenses] = $38,476.

[42]$88,736 ÷ 55% = $161,338 in projected revenue from the sale of used vehicles in 1997. The lost profits on these sales is $19,673 - $3,467 [additional sales expenses] = $16,206.

Tenn. R. Civ. P. 54.04(2) permits prevailing parties to recover "reasonable and necessary expert witness fees for depositions or trials." This provision limits recovery to the fees charged by expert witnesses to give testimony at deposition or trial.[43] Accordingly, we have construed this language to exclude expert witness fees for preparing for depositions or trial, no matter how reasonable and necessary these fees are. *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d at 38. Dr. Kelsay's fees incident to the preparation of Waggoner's Tenn. R. Civ. P. 59.04 motion are not fees for giving testimony at deposition or trial. Therefore, the trial court erred by awarding Waggoner these fees, and the award for discretionary costs should be reduced from $11,170.00 to $8,501.25.[44]

## VI.

We affirm the trial court's judgment that the Waverly Church of Christ is liable for the damages to Waggoner Motors, Inc. caused by the paint overspray; however, we modify the judgment to award Waggoner $85,692.00 in damages and $8,501.25 in discretionary costs. The case is remanded to the trial court for further proceedings consistent with this opinion. The costs are taxed in equal proportions to Waverly Church of Christ and its surety and to Waggoner Motors, Inc., for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., J.

---

[43] We have also held that in some circumstances, a prevailing party is entitled to recover stand-by fees charged by an expert witness who has been required to be on call to testify at trial. *Stalsworth v. Grummons*, 36 S.W.3d at 836.

[44] We need not determine whether other fees awarded by the trial court are properly discretionary costs because the church has only challenged Dr. Kelsay's fees related to Waggoner's Tenn. R. Civ. P. 59.04 motion.