IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2014 Session

## BORLA PERFORMANCE INDUSTRIES, INC. v. UNIVERSAL TOOL AND ENGINEERING, INC.

**Appeal from the Circuit Court for Washington County**
**No. 27603     Thomas J. Seeley, Judge**

_____

**No. E2014-00192-COA-R3-CV-FILED-MAY 26, 2015**

_____

Borla Performance Industries, Inc. (Borla) entered into two contracts with Universal Tool and Engineering, Inc. (UTE), by the terms of which UTE was to repair and refurbish six of Borla's pipe bending machines, which  machines are used in Borla's business of designing and manufacturing automobile exhaust systems.  Borla later sued UTE for breach of contract, negligent misrepresentation, and violation of the Tennessee Consumer Protection Act (TCPA).  Borla alleged that as a result of UTE's failure to timely repair and deliver the machines, which are also known as "benders," Borla incurred lost profits in the amount of $486,166.  After a four-day bench trial, the court dismissed Borla's negligent misrepresentation and TCPA claims; the court did grant Borla a judgment for $11,839.98 on its breach of contract claim.  The trial court held that Borla failed to prove that it incurred lost profits as a result of a breach of contract by UTE.  Borla appeals the trial court's judgment denying its claims for lost profits.  Borla also appeals the court's judgment dismissing the TCPA claim.  UTE appeals the judgment against it for breach of contract.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Mark S. Dessauer, Kingsport, Tennessee, for the appellant, Borla Performance Industries, Inc.

Arthur M. Fowler and Arthur M. Fowler, III, Johnson City, Tennessee, for the appellee, Universal Tool and Engineering, Inc.

**OPINION**

I.

In 2006, Borla decided to relocate its Michigan and California facilities to a new plant in Johnson City. In manufacturing vehicle exhaust systems, Borla uses pipe bending machines. The benders are roughly 20 feet long, four to five feet wide, four feet tall, and weigh about 8,000 pounds. In October of 2007, UTE sent its sales representative, Bill Swartz, to Borla's California plant to evaluate three benders. On October 27, 2007, Swartz sent an estimate to Borla for the cost of repairing and refurbishing these benders. Borla issued a purchase order on May 2, 2008 for upgrading the three benders, describing the work as follows:

> Upgrade Tube Bending Machine: Replace all existing or missing original controller[s] with new UTE Windows XP based controllers. Dismantle and Replace Electrical components using existing electrical panels where feasible. Add new servo[]s to carriage. Convert chain drive to rack and pinion. Add new remote operator ped[e]stal and console. Add new safety mats (01 per machine). Paint (brush and roll) each machine to match original colors. Black oxide tool holders.

The purchase order also stated "estimated completion 3-4 weeks" and listed the "date required" as May 30, 2008. The price for the repair work on the three benders was set at $115,000. Borla shipped the three benders (the California benders) to UTE's plant in Johnson City, and they arrived on April 17, 2008.

At an earlier time, in January of 2008, Borla entered into another contract with UTE to service three benders that were located in Michigan. One of these benders was determined to be in such poor condition that it was not economically feasible to salvage it, so UTE was ultimately required to do work on only two of the Michigan benders (the Michigan benders). Borla shipped the Michigan benders to UTE's Johnson City plant in January 2008. A purchase order for the work was issued on January 16, 2008, and revised on March 12, 2008. The revised purchase order states: "Borla Owned Machinery to be Evaluated and serviced for minor repairs. All Machinery to be cleaned[,] stripped[,] and re-painted." Regarding one of the two Michigan benders, the purchase order further specifies that work "Includes Touch Screen and Clips, repair and replace exposed wiring

2

and frayed hoses, and Labor. This machine to be Delivered to Tennessee Borla Facility in 2 weeks." The "date required" on the purchase orders was listed as "TO BE DETERMINED." (Capitalization in original.)

UTE worked on the Michigan Benders and had them ready to ship to Borla's Tennessee plant on April 15, 2008. Borla picked up the Michigan benders on April 21, 2008. According to Borla, the Michigan benders were able to power up, but "they would not operate such that they could be used by Borla in production." Borla hired James Garen to come to its Tennessee plant, get the Michigan benders in working order, and train Borla's workers to operate the benders. Garen performed that work in early June of 2008, and the Michigan benders were operational on June 9, 2008. Garen charged Borla $11,839.98 for his work.

On June 12, 2008, Borla visited the UTE plant to inspect the California benders. Borla requested UTE to do a full evaluation of the California benders and report back as to what was needed to get them fully operational. On June 17, Borla authorized UTE to do the additional work suggested by UTE. After this work was completed in July of 2008, the parties discovered that the three-inch cylinders on the California benders were not big enough to bend the pipe that Borla needed in order to make parts. Borla then authorized UTE to install four-inch cylinders. On October 28, 2008, one of the California benders was delivered to the Borla plant, inspected, and found acceptable by Borla.

Frustration mounted on both sides. UTE complained that Borla frequently took parts off the California benders, or "cannibalized" them, while they were at UTE's plant,[1] in order to allow Borla's other benders to function. UTE alleged that Borla took the "servo valves" from the two remaining California benders, which were essential parts, and that Borla did not provide the tooling necessary to properly test the benders. Borla expressed frustration at the delays in repairing the benders and UTE's perceived inability to get them in functioning order. Borla paid only $75,000 of the $115,000 invoice for UTE's work on the California benders. UTE kept possession of the two remaining California benders for the next several years. Borla did not provide the servo valves allegedly necessary to make the benders work until it was ordered to do so by the trial court.

Borla filed its complaint on May 4, 2009. UTE answered and counterclaimed for breach of contract. A bench trial began on August 15, 2013, and ended on August 20, 2013. In support of its claim for lost profit damages, Borla presented the testimony of its chief financial officer, Allan Stoner. He explained that Borla's plan for smoothly

_____

[1] Apparently, the distance between UTE's facility and Borla's plant in Johnson City was only about ten miles.

transitioning its manufacturing facilities from California to Tennessee depended upon Borla having the Michigan benders operational and timely delivered to Borla's Johnson City plant so Borla could train its employees on the benders. Borla ceased production at its California plant around July 1, 2008. Stoner summarized Borla's claim as follows:

> had we had those machines here earlier from Michigan, we would have been able to train in the controlled environment, and then those employees that were trained would have been able to provide the bending – bent materials earlier providing additional capacity and – or if we had those three machines from California at all able to provide additional capacity, we would have been able to add an amount of product that we could have sold to our customers.

Stoner testified that if everything had gone according to Borla's timetable and plan, Borla would have been able to sell an additional one million dollars' worth of products. After deducting the estimated costs of producing the additional parts, Stoner opined that a total of $486,166 in lost profits was "attributable to UTE's failure to perform under the . . . bending machine contracts related to Michigan and California."

UTE argued that it had fully and timely performed its duties under the contracts, and that any delays in getting the benders repaired as agreed were the result of Borla's actions. On the lost profits claim, UTE presented the expert testimony of Richard Ray, who concluded that Borla's "damages calculation is speculative and clouded by factors other than the actions of [UTE]." Ray opined that, while it was undisputed that Borla lost a great deal of money in 2008 – a total of $3,403,736 according to Stoner's 2008 income statement – the losses were likely caused by other factors, including the general sharp economic downturn, the initially inefficient operation of the new plant, and unrelated labor issues. Ray testified that Stoner's estimate of $1,000,000 additional revenue was speculative and unfounded in his view.

At the end of trial, the court dismissed Borla's claims for negligent misrepresentation and violation of the TCPA, finding that Borla failed to satisfy its burden of proof to establish those claims. The court delivered a memorandum opinion in which it found and held as follows:

> Let me talk about the two Michigan benders first and the contract there, the purchase order from Borla says Tube Bender Evaluation and that's what was required of UTE. We know that those benders were delivered to Borla on April 21, 2008, and I know there was testimony concerning the fact

4

they didn't work well or did not work, and . . . there was testimony that as far as UTE was concerned they weren't transported correctly. They were picked up in a rollback fashion and they weren't delivered on a – I think they called it an air truck. In any event, Mr. Garen was called and came from California to get the machines in operation and also to train the employees, and he did that, and he was out of there by June 9, 2008. His bill was $11,839.98.

I think the proof is sufficient that some more work needed to be done. There may have been loose wiring and other minor things that were basically damaged in transport, but the Court feels there's sufficient proof to find in favor of Borla on that and will find that UTE is responsible to Borla for $11,839.98.

With respect to the two California benders still in possession of UTE, . . . I do believe that the cannibalization did occur. I'm going to find the proof is sufficient to find that those machines do not have the two servo valves.

[T]his is what I'm going to order: That Borla supply the two servo valves needed for those two California benders. If there are any other parts missing, UTE is responsible for replacing those parts to make it operable. And after getting the servo valves and any other parts that UTE has to get, if the machine[s are] up and running, then Borla shall pay the remainder due on the contract. No interest, no nothing. If after Borla supplies the two servo valves, . . . the two machines are not working, they're not up and running, then they'll be returned to Borla as is and Borla will be refunded the difference between the cost of fixing one machine, which was somewhere in the neighborhood of $38,000, $39,000 – that will be deducted from the $75,000 and UTE will be responsible for reimbursing Borla the difference. As I said, if the machines are up and running and the two servo valves are supplied by Borla, Borla will owe the rest of the money, the $40,000.

. . . I do think basically UTE has a lien on them until they're paid. But again, they're not going to get paid until they're up

5

and running and that basically means the servo valves and any other parts that are needed on them.

The parties complied with the trial court's order after trial. Borla provided the servo valves, and after the benders were tested, it paid UTE the balance due on the contract and took possession of the California benders. This aspect of the trial court's judgment – the disposition of the California benders – has not been appealed. Regarding the claim for lost profits, the trial court held as follows:

> What's significant to me is, of course, Borla has the burden of proof on that issue. Borla contends that they weren't really subject to the downturn that occurred starting in 2007 and took a sharp decline in 2008, and I think we all know that that decline was felt to a greater extent possibly by the auto industry than most other industries, and I understand Borla's position that they have a niche market and they don't think that that decline would affect them as much. I don't really know, but I know there was a general decline across the country in 2008. It was a sharp decline. I know that plant relocations cost money and I know Mr. Ray talked about the decline in California sales. . . . [I]t seems like the best proof of lost sales, are sales that Borla lost because they couldn't meet the demand, cancelled sales that they say they lost – and that's basically what they said they lost as a result of the lateness in these machines going on line.

> There's no documentation of any lost sale; there's no documentation of any cancelled sale. There's no documentation of any order that could not be filled, and that's the best evidence, it seems, to show this court that there really were some lost sales. It's pointed out by UTE the three benders that remained in California were here and on line sometime in the summer.[2] They were here in July 2008, and they had the two Michigan benders working at that time. Also, the problem Borla had with training local workers had to adversely affect Borla's reaching full capacity production. That was a significant problem that contributed to lost profits.

---

[2] Borla had at least three other benders at its California plant that were not involved in the UTE contract and were shipped to the new Tennessee plant as part of the transition.

6

I find basically that with respect to lost profits that Plaintiff has not proved with reasonable certainty that the decline in their gross revenues and net profit between 2007 and 2008 was attributable to any actions of UTE. There's no question they sustained a loss between 2007 and 2008, but the proof is lacking that that loss occurred as a result of the actions of UTE in delaying getting these machines on line. The Court's going to find there's no loss of profits by Borla.

(Footnote added.) Borla timely filed a notice of appeal.

## II.

Borla raises the following issues, as quoted from its brief:

1. Did the trial court err in concluding that Borla failed to meet its burden of proof and in failing to award Borla lost profit damages?

2. Did the trial court err in concluding that Borla failed to meet its burden of proof on its claim under the Tennessee Consumer Protection Act and in dismissing such claim?

UTE raises the following additional issue:

Did the trial court err in holding that UTE breached the contract relating to the Michigan benders?

## III.

Our review of this non-jury case is de novo upon the record of the proceedings below with a presumption of correctness as to the trial court's factual findings, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). "When the resolution of an issue depends upon the credibility of witnesses, '[t]he weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.' " *In re Conservatorship of Tate*, No. M2010-01904-COA-R3-CV, 2011 WL 6935342 at *3 (Tenn. Ct. App. M.S., filed Dec. 29, 2011). We review the trial court's conclusions of law de novo with no presumption of correctness. *Oakes v. Oakes*, 235 S.W.3d 152, 156 (Tenn. Ct. App. 2007).

7

IV.

A.

Borla argues that the trial court erred in refusing to award it lost profits as a part of its damages for breach of contract. As both parties and the trial court recognized, this Court set forth the principles governing a claim for lost profits damages in *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58-59 (Tenn. Ct. App. 2004):

> [A]n injured party may recover lost anticipated profits when their nature and occurrence have been established with reasonable certainty. *Baker v. Hooper*, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001); *Tire Shredders, Inc. v. ERM–North Cent., Inc.*, 15 S.W.3d 849, 857 (Tenn. Ct. App. 1999); 1 RECOVERY OF DAMAGES FOR LOST PROFITS § 1.4, at 9.
>
> The reasonable certainty standard applies chiefly to the evidence regarding the existence of damages. 1 RECOVERY OF DAMAGES FOR LOST PROFITS § 1.6, at 17. It is a flexible standard that permits the courts to take the particular facts of each case into consideration. The existence of damages has been proven with reasonable certainty when the mind of a prudently impartial person is satisfied that the injured party has been damaged.
>
> Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision. *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 200 (Tenn. Ct. App. 1990); *see also Authentic Architectural Millworks, Inc. v. SCM Group USA, Inc.*, 262 Ga. App. 826, 586 S.E.2d 726, 731 (2003). After the fact of damages ha[s] been established, less certainty is required with regard to the amount of the damages. The amount of lost profits damages may be based on estimates. While definite proof regarding the amount of damages is desirable as far as it is reasonably possible, it is even more desirable that an injured party not be deprived of compensation merely because it cannot prove the extent of the harm suffered with complete certainty. Restatement (Second) of Torts § 912 cmt. a (1979). This principle is based on the policy that defendants should not be permitted to

8

complain about the lack of exactness or precision in the proof regarding the amount of damages when their wrongdoing created the damages in the first place. *Walgreen Co. v. Walton*, 16 Tenn. App. 213, 223, 64 S.W.2d 44, 50 (1932); 1 RECOVERY OF DAMAGES FOR LOST PROFITS § 5.2, at 385.

An award for lost profits damages depends on whether the evidence provides a satisfactory basis for estimating what the injured party's probable earnings and expenses would have been had the wrongdoing not occurred. Since lost profits can rarely be computed down to the last penny, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been.

Anticipated future profits may be reasonably ascertained from the past volume of the injured party's business and from other provable data relevant to probable future sales. The best evidence of lost profits is a comparison of the experience of the injured party's own business before and after the wrongdoing.

Damages for lost profits must be based on net profits, not on gross revenues or on gross profits. In cases involving the loss of expected profits from the sale of goods, the expected net profits equals the expected revenue from the sale of the goods minus the cost of the goods sold minus all of the seller's expenses fairly attributable to the sale of the goods. Thus, persons seeking to recover for lost expected profits must prove not only the probable income from the sale of the goods but also the expenses they would have incurred to produce that income.

(Footnotes and internal citations omitted.)

The trial court quoted *Waggoner Motors* and discussed and applied the principles quoted above in deciding the lost profits issue. In support of its assertion that the trial court erred in refusing to award lost profits, Borla makes the following argument, as quoted from its brief:

The Trial Court held Borla to too high or an erroneous legal standard for lost profit damages by requiring Borla to provide documentation of lost or cancelled sales as the "best evidence" of lost profits when, under applicable law, Borla was only required to provide reasonably certain evidence of its lost profits. There is no requirement under Tennessee law that lost profits be proven with the "best evidence", as held by the Trial Court.

We believe this argument is based upon a misinterpretation of the trial court's statements and its holding. The trial court did not hold that the "best evidence" of lost profits must be presented to recover such damages. Nor did the court base its ruling entirely on Borla's failure to present documentation of any lost or cancelled sales in 2008. The trial court observed that "the best proof of lost sales, are sales that Borla lost because they couldn't meet the demand, cancelled sales that they say they lost . . . as a result of the lateness in these machines going on line." Borla's failure to provide such proof was an important factor, but it was not the only factor supporting the trial court's decision, nor was it necessarily the dispositive factor. The trial court's decision is supported by a number of additional factors, as further discussed below.

As already noted, Borla's theory was that the delays in getting the Michigan and California benders repaired, shipped to its new Tennessee plant, and ready for production, caused it to lose sales and resulted in lost or cancelled orders for automobile parts. In support of this theory, CFO Stoner testified:

The plan that Borla had was that when production ceased in California that the Tennessee facility had to be up and . . . producing product at volume to satisfy the customer demand and to maintain the revenue stream. Therefore, we had to be training the [Tennessee] employees on benders and the other skill sets prior to having to go live production in order to have them experienced enough that they can provide product for the customers.

\* \* \*

We did not have the capacity, as I said, for two reasons. The fact that we did not get the two Michigan benders early enough to start training so that the Tennessee employees were up to speed when California shut down. Or if we would have had the three California benders to us, we would have been

10

able to train on that because they were supposed to be there. The original plan was that they would be there. . . the end of May. Had we had those machines there, we would have been also training – ramping up on those, and we would have had the ability to build product on that. And . . . if we'd been able to move those up two months, or on the three California machines having had them when they were scheduled, we would have had them as incremental revenue producing machines. We're saying that $1 million of revenue was possible for – if we had had those events.

\* \* \*

Q: So . . . the amount . . . of lost profit damages, $486,166 that in your opinion are attributable to UTE's failure to perform under the two . . . bending machine contracts related to Michigan and California?

A: Yes.

UTE's expert, Ray, testified as follows in support of his opinion that Stoner's "damages calculation is speculative and clouded by factors other than the actions of" UTE:

[I]n evaluating the fact of damages, I have three situations . . . that really cause me concern as to whether there has been proof with reasonable certainty. Those three are: the general economic downturn experienced in the U.S.A. in the automotive industry. The second is this . . . whole overarching issue of the plant relocation, and specifically the effect of the failure of [Borla] to execute its relocation objective. That's number two. And the third point that clouds the fact of damages proof is the calculated loss of the California customer base.

\* \* \*

I took a look at the Bureau of Economic Affairs report for value add[ed] for gross domestic product for 2008 versus 2007 in the . . . automobiles and parts industry. That industry suffered a 33 percent reduction in sales in 2008 compared to

11

2007. That's in line with the reduction in sales that Borla experienced from 2008 to 2007. So we have the issue of a general economic downturn that has impact in a properly calculated "but for" loss determination. One has to take into consideration the general economic downturn.

Regarding Stoner's estimation of one million dollars in lost sales, Ray stated:

> I don't know how the $1 million came up. That's my problem is I didn't see objective basis for the $1 million revenue.
>
> *        *        *
>
> Q: And would you agree with me that Mr. Stoner's analysis is a reasonable one?
>
> A: No.
>
> Q: What about a rational one?
>
> A: Relative to $1 million lost profit -- lost revenue?
>
> Q: Yes.
>
> A: I think it's speculative.
>
> THE COURT: Well, your whole position is, isn't it, that the fact of actual damages resulting from any act of UTE has not been proven with reasonable certainty?
>
> THE WITNESS: Within – yes, Your Honor, within reasonable certainty within the cloud of the overarching issues that we described earlier. . . . [W]hen we look at the calculation, I just – I cannot subscribe to starting with: Let's start with a million dollars and figure out what the lost profits would be on that. . . . As far as a calculation is concerned, it has to be . . . based with convincing best available proof as to the rationale behind the million dollars. Where did the million dollars come from? I'm used to seeing product numbers, customers, volumes and prices.

Regarding documentation, or lack thereof, of any of Borla's alleged lost sales, CFO Stoner testified as follows:

> Q: Now, during the months of May, June, July, August and September of 2008 were there customer orders that Borla was unable to fill?
>
> A: Yes.
>
> Q: And why could those orders not be filled?
>
> A: Those orders could not be filled because Borla did not have the ability to meet the production in – starting in July. We could not meet the production because we did not have the bending capacity to provide enough volume to provide that tubing to the rest of the final assembly welders and make that finished goods. So customers were contacting us. We were unable to provide that, so they either cancelled orders or did not place orders.
>
>           *      *      *
>
> [B]ecause we did not have the capacity to meet the customers when they called and when they say, "I need a product," if we do not have that product available and can confirm we can make that product within their time line of when they need it, they will not place an order and they will, in fact, go to our competitors for the product.
>
> Q: Okay. You never furnished us with a list of those cancelled orders, have you?
>
> A: I was never asked to.
>
> Q: All right, sir. The – and you don't have a list? You didn't get a list? You didn't compile a list of the cancelled orders to come up with this million dollars of lost profits you've testified about, have you?
>
> A: No, I did not.

13

In reaching its conclusion that Borla did "not prove[] with reasonable certainty that the decline in their gross revenues and net profit between 2007 and 2008 was attributable to any actions of UTE," the trial court quite rationally observed that Borla would have been well served to provide documentation of the lost or cancelled sales that it alleged were the cause of its financial losses in 2008. The trial court did not state that such proof was required to recover lost profits. Neither has this Court made such a statement; but we did observe in *Waggoner Motors* that "definite proof regarding the amount of damages is desirable as far as it is reasonably possible," and that "[p]arties seeking to recover lost profits damages would be well advised to provide the best available proof as to the amount of their loss that the particular situation permits." 159 S.W.3d at 58 n.29.

Moreover, the trial court did not find that UTE breached the contract for the California benders. UTE, in support of its argument that any delays in getting the California benders were caused by Borla's actions, presented the testimony of its design engineer, Matt Raby, who stated:

> Q: During [UTE's] . . . repair or retrofitting these machines, did you-all need to do testing on the machines to make sure that they would work properly?
>
> A: Certainly. Yes, sir.
>
> Q: And . . . where did you get the tooling and the piping to do that testing?
>
> A: That was Borla's tooling and pipe.
> Q: Okay. And did you have difficulty getting tooling and pipe from Borla to do the testing as you were repairing the machines?
>
> A: Yes, sir. . . . I remember sometimes we would get tooling and have it for an hour and then somebody would come and get it because they needed it for production at the facility. So, yes. And then we may not hear from them for a couple of weeks or days or – so yes, it was a difficult process.
>
> Q: Are you aware of any parts on the California machines being removed and taken to the Borla plant?

14

A: Yes, sir.

Q: And how often did that happen?

A: Several times.

Q: And when they had that -- the components of the bending machines, did that interfere with your ability to repair them?

A: 100 percent.

* * *

Q: When the machine – California machine was picked up by Borla and taken to its plant, were the other two machines also ready to be picked up?

A: I don't recall. They were – they'd had parts taken from them and some of the bend arm mechanisms and some of the hydraulic control system to repair machines that were on their floor. . . . I don't recall at the time whether the components had been taken from the machines and they were operational because they . . . were many months that they sat there with the parts that had been taken and not replaced by them.

THE COURT: Who – who took the parts?

THE WITNESS: Borla employees.

THE COURT: Okay. . . . I've heard the term cannibalize. Is that –

THE WITNESS: Accurate, yes, sir.

THE COURT: Is that what you're talking about?

THE WITNESS: Uh-huh.

THE COURT: Yes?

15

THE WITNESS: It happens in the industry. If you have machines that are idle, you go to repair a machine that you need to be functioning, you'll take parts from an idle machine and it sits aside and it's forgotten about.

*    *    *

Q: And you really have no knowledge, do you, why the other two California machines were not delivered to Borla?

A: Sure I do. They – they didn't work. There were parts missing from the machine that had been taken to their production facility and placed on others.

Robert Rasnake, a UTE machinist who did some of the work on the California benders, similarly testified as follows:

Q: [T]ell the Court what you know about the Borla employees coming and taking parts off the California machines and taking them back to Borla.

A: We were trying to get the three machines running and two of them, they kept coming and robbing different parts off, and we could – we got them to a point that we could – you know, we needed the parts and we could never get those parts back.

Q: Okay. And did that slow down your-all's work?

A: On two of the machines, yes.

Q: [W]hat about the tooling? Did – could you get the necessary tooling when you needed it from Borla to do the work?

A: They would bring us tooling and they would be right behind with another guy to pick it up saying they needed that to run production, and they would bring it by that evening or that night and then be there first thing the next morning to pick the tooling up again saying they needed it for production again. It was very hard to get tooling available to actually do a runoff.

16

Q: Now, . . . describe the tooling that was brought.

A: A lot of times it was mix matched. It was wore out. Sometimes it would be decent tooling, but we wouldn't even – we would be starting to put it on the machine and they would come by and take it off and have to take it back to the plant.

Q: Now, the – was one of the pieces of equipment that was taken called a servo valve?

A: Yes, sir.

Q: And what does a servo valve do?

A: It controls the bend arm. It's a – it's basically an electronic hydraulic valve that controls the bend arm.

Q: Now, without that can you operate the machine?

A: No, sir.

Q: How many of those servos did Borla come and take from those machines?

A: Two of them.

The trial court found that "the cannibalization did occur" and ordered that "Borla supply the two servo valves needed for those two California benders." The trial court was prepared to enforce the California benders contract, but did not hold that either party breached it. Consequently, because UTE did not breach the California benders contract, it cannot be held liable for Borla's lost profits allegedly due to the delays in getting the California benders fixed and in production.

CFO Stoner testified that the alleged $486,166 in lost profits "are attributable to UTE's failure to perform under the two . . . bending machine contracts related to Michigan and California," but when he was asked, "in coming up with these damages, lost profit that you've come up with, you did not segregate the two contracts, the Michigan benders contract and the California benders contract, did you?", he answered, "I did not." This failure to separate damages attributable to the alleged breach of the

17

Michigan contract, *vis-à-vis* the California contract, introduces another variable of significant uncertainty into Borla's lost profits claim.

The trial court also found that Borla's unrelated labor problems at its new Tennessee plant likely contributed as a cause of its lost profits. The evidence does not preponderate against this finding. UTE presented the testimony of John Thompson, a bureau chief with the Johnson City Press, who in March of 2009 interviewed Alexander Borla, CEO and owner of Borla Performance Industries, Inc., for a newspaper article. Thompson testified:

> Q: Did [CEO Borla] talk to you about a couple of crises that ha[d] occurred at the plant?
>
> A: Yes.
>
> Q: And what were those crises?
>
> A: I remember him talking about the work force that he initially received was not adequate and he had to step into the matter and pick more capable workers.
>
> *     *     *
>
> Q: [A]s far as the work force issue, does that refresh your memory?
>
> A: Yes. I did have some memories from those that did need to be refreshed. I remember him talk – talking about that and it was kind of distressing to me to hear that East Tennessee workers were not up to – up to par for him.
>
> Q: And so what did he say he did?
>
> A: He found better workers.
>
> Q: Okay. He – I think you say in [the newspaper article] he cleaned house.
>
> A: Yes.

Alexander Borla testified as follows regarding the labor problems at the startup plant:

Q: Now, after you started operations here, . . . did you have to come in personally and clean house and start rehiring?

A: We had – we had a greater turnover in the beginning which is fairly customary and usual in all companies starting in a new area. I hired a general manager who was familiar with the area and I wasn't. He was familiar with the customs and the work force and the culture, and he basically improved our employee base significantly.

Q: Did you ever have to come in and clean house?

A: He's the one who cleaned house, sir.

Q: All right, sir. And he did that in 2008, didn't he?

A: Yes, sir.

Q: All right, sir. In the . . . first group of employees that you got, they were sent over by the economic development people, [weren't] they?

A: Some were, yes, sir.

Q: And they couldn't meet your production levels, could they?

A: They could not meet our attendance level, sir.

\*   \*   \*

Q: And you mentioned that with certain employees or certain personnel you had to clean house – used the word "clean house." I don't know if those were your words or Mr. Fowler's, but did you mean that you let everybody go?

A: No, sir. We probably had a 20, 25 percent turnover.

In order to prevail on its claim for lost profits, Borla had the burden to present evidence that "provides a satisfactory basis for estimating what [its] probable earnings

and expenses would have been had the wrongdoing not occurred." ***Waggoner Motors***, 159 S.W.3d at 58-59. The trial court held that Borla failed to prove with reasonable certainty that its lost profits were caused by UTE's breach, finding that other factors likely caused the losses, including (1) the sharp general economic downturn in 2008; (2) Borla's labor problems and costs associated with its plant relocation; and (3) Borla's actions that resulted in delays getting the California benders repaired and in production. The trial court also heard, and apparently credited, Ray's expert testimony opining that the estimate of Borla's lost sales revenue was unreasonable and speculative. Finally, the court considered as a factor Borla's failure to provide documentary evidence of any lost sales. Considering the totality of these factors and the circumstances as a whole, the evidence does not preponderate against the trial court's judgment declining to award Borla lost profits as part of its damages.

## B.

We next address UTE's assertion that the trial court erred by finding it breached the Michigan benders contract. As already stated, the purchase order for the work on the Michigan benders states: "Borla Owned Machinery to be Evaluated and serviced for minor repairs. All Machinery to be cleaned[,] stripped[,] and re-painted," and further specifies that work on one of the benders "Includes Touch Screen and Clips, repair and replace exposed wiring and frayed hoses, and Labor." UTE engineer Raby testified as follows about the Michigan benders agreement:

> Q: [W]hat was UTE to do on the first two machines that came in from Michigan?
>
> A: I think it's best summed up with three words, repair and replace. Our understanding – my understanding of this contract when it came into our shop was to make a pit stop for these machines. They were to be functioning machines. We were to make them pretty because they were going into the new facility, so I included a paint job. Inspect them for minor mechanical wear. Look them over. If there were any major mechanical wear and identify it and then take action after consulting with them. Replace hydraulic hoses that may have worn with age. Inspect for any wiring damage and replace if necessary. And it was more of a maintenance pit stop.
>
> \*       \*       \*

20

[W]e were given those machines as working machines. We were – we were essentially painting. I equate it to putting your car in the body shop for a paint job and then getting mad at them because your engine stopped. That's kind of how I feel that went down is that – you know, it was a pit stop, look them over, make sure they're okay, paint them, get them ready to go on our floor. We're taking them out of production here. We're going to stop them here for a couple of weeks just to let you look them over and put them on our floor. And that didn't turn out to be the case. They had some serious problems. Well, they had problems big enough that would keep them from going into production and I questioned whether they were in Michigan.

The trial court heard conflicting testimony about the condition of the Michigan benders when they arrived at the Borla plant on April 21, 2008. Tim Lovelady, a Borla employee, testified as follows:

Q: [A]fter their delivery, did the two [Michigan] bending machines operate such that they could be used by Borla in production?

A: No, sir.

Q: And what problems or deficiency were with the machines that precluded their use in production?

A: Basically, we just couldn't get them to run. We could get them to power up, but we couldn't get them to operate. That was fundamentally the problem with them. And then when we did get them to get them moving a little bit, we couldn't get them to repeat and so they were inoperable to us.

Q: What do you mean by repeat?

A: When the machine would bend a certain degree, it couldn't bend that same bend repeatedly. It may bend one at 90 degree, the next time it may be, you know, 110 degrees or less or something like that. It couldn't bend the same bend over and over and over.

Q: And given the condition or the operation of the machines as you describe, were you able to train anybody to operate them?

A: No, sir.

Q: And did UTE send out any representative to work on the machines?

A: Yes, sir.

Q: Were they able to get them operational so you could put them in production?

A: No, sir.

*　　*　　*

Q: All right, sir. Now, after Mr. Garen came and finished training –

A: Yes, sir.

Q: – and he left, those machines worked fine, didn't they?

A: Yes, sir.

Darrell Adams, a repair and maintenance technician for Borla, testified as follows:

Q: And were you present at Borla on 4/21/08 when the two machines arrived?

A: Yes.

Q: And do you recall any wires being loose on the machines?

A: No, sir.

Q: Do you recall any damage that had occurred in transit of the machines from UTE to Borla?

22

A: No, sir.

Q: And did you power up the machines?

A: Yes, sir.

Q: And after their delivery did the two machines operate such that they could be put in production?

A: No, sir.

Q: And what problems did you discover with the machines as to why they would not operate?

A: The double stack [bender] had a bad Y motor. The single stack [bender] had some voltage problems to be adjusted.

\* \* \*

Q: Could you take a look [at] the two Garen and company invoices. Were you present when Mr. Garen did his work on the two Michigan benders?

A: Yes, sir.

Q: And after he performed his work, was Borla able to use those two benders in production?

A: Yes, sir.

Finally, Alexander Borla testified as follows:

Q: [W]hat was intended by Borla with respect to requesting UTE to do a tube bender evaluation?

A: Basically to inspect them, repair them as necessary.

Q: Was there any time that any repair work . . . that UTE identified was necessary on these machines refused by Borla?

A: No. . . . as a matter of fact, we would encourage UTE to find more things wrong with the machine so they could repair more things [so] that we could rely on the machine to a greater degree on the floor.

Q: And if you could turn to . . . the two Garen Company invoices.

A: Yes.

Q: And the work that [Garen] describes in his notes on the two invoices, did you consider that work to be within the scope of the work you had requested UTE to perform on the Michigan benders?

A: Yes.  As the absence of this work prevented these machines from working and we expected a fully working piece of equipment from UTE.  Yes.

UTE did not dispute that the Michigan benders needed more work to properly function after they were delivered to the Borla plant.  UTE's witnesses testified to the effect that the additional work needed was beyond the scope of its contract with Borla; that the repairs needed were relatively minor "tweaks" that did not take Garen long to fix; that some of the mechanical issues were caused by Borla's improper transportation of the benders; and that most of Garen's time was spent training Borla workers on the machines, not fixing them.  The trial court resolved the conflicting testimony on this issue in Borla's favor, and found UTE liable for the amount charged by Garen for his work on the Michigan benders, $11,839.98.  The evidence does not preponderate against the trial court's ruling regarding UTE's breach of the Michigan benders contract, and we affirm it.

C.

Borla argues that the trial court erred in dismissing its TCPA claim.  As this Court has recently observed,

> The Tennessee Consumer Protection Act, Tennessee Code Annotated Sections 47–18–101, *et seq.* ("TCPA"), prohibits, among other things, "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47–18–104(a). . . . A "deceptive" act or practice is "one that causes or tends to cause a consumer to believe what

24

is false or that misleads or tends to mislead a consumer as a matter of fact." ***Tucker v. Sierra Builders***, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005) (citations omitted). An act or practice may be deemed unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." ***Id.*** at 116-17 (citing 15 U.S.C. § 45(n)). Because the TCPA is remedial, courts have determined that it should be construed liberally in order to protect the consumer. ***Id.*** at 115. In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act; and (2) that the defendant's conduct caused an "ascertainable loss of money or property. . . ." ***Id.*** (quoting Tenn. Code Ann. § 47–18–109(a)(1)); *see also* ***Cloud Nine, L.L.C. v. Whaley***, 650 F.Supp.2d 789, 798 (E.D. Tenn. 2009) ("plaintiffs asserting claims under the [TCPA] are required to show that the defendant's wrongful conduct proximately caused their injury). . . .

Whether a particular representation or act is "unfair" or "deceptive," within the meaning of the TCPA, is a question of fact, ***Id.*** at 116 (citation omitted), which we review *de novo* upon the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Furthermore, when the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues.

***Audio Visual Artistry v. Tanzer***, 403 S.W.3d 789, 809-10 (Tenn. Ct. App. 2012).

The trial court held as follows at the close of trial:

the Court's not going to find any negligent misrepresentation, nor am I going to find any violation of [the] Tennessee Consumer Protection Act. I think this is a breach of contract case. The damages would be approximately the same whether it's negligent misrepresentation or as far as consequential damages or compensatory damages, be the

25

same under the [TCPA] without the penalties that the [TCPA] has. But generally when you think about the [TCPA], you're talking about basically fraudulent or deceptive practices, and I don't find there's sufficient proof of any fraudulent or deceptive practices on behalf of . . . UTE. Of course, on all of those issues Borla has the burden of proof and I don't think you sustained the burden of proof with respect to negligent misrepresentation or a violation of the Tennessee Consumer Protection Act.

Borla argues that the trial court erred in its legal analysis, in that the TCPA "does not require proof of fraud nor is it coterminous with fraud or fraudulent conduct." Borla asserts that the TCPA "is much broader than fraud[,] and a consumer under the TCPA can recover without meeting the burden of proof that is required for common law fraud," citing *Tucker v. Sierra Builders*, wherein we stated,

The scope of the TCPA is much broader than that of common-law fraud. Under the TCPA, a consumer can obtain recovery without having to meet the burden of proof that is required in common-law fraud cases, and the numerous defenses that are available to the defendant in a common-law fraud case are simply not available to the defendant in a TCPA case. Misrepresentations that would not be actionable as common-law fraud may nevertheless be actionable under the provisions of the little FTC acts, including the TCPA. Claims under the TCPA are not limited to misrepresentations that are fraudulent or willful. *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 12–13 (Tenn. Ct. App. 1992). Instead, the TCPA applies to any act or practice that is unfair or deceptive to consumers. Tenn. Code Ann. §§ 47–18–104(a), –104(b)(27).

\*　　\*　　\*

The concept of deceptiveness is a broader, more flexible standard of actionable merchant misconduct than the traditional remedy of common-law fraud. A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact. Thus, for the purposes of the

26

TCPA . . . the essence of deception is misleading consumers by a merchant's statements, silence, or actions.

180 S.W.3d 109, 115, 116 (Tenn. Ct. App. 2005) (footnotes and internal citations omitted).

As *Tucker* illustrates, Borla is obviously correct in its assertion that a TCPA claim is broader than a common-law fraud claim, and thus the trial court's statement that "generally when you think about the [TCPA], you're talking about basically fraudulent or deceptive practices" was a bit loose in this regard. But we have carefully reviewed the record and have found no evidence of deceptive or misleading conduct on the part of UTE, and the court therefore correctly found no cause of action under the TCPA. Borla did not appeal the trial court's dismissal of its negligent misrepresentation claim, likely because there is no proof that any agent of UTE made any material or actionable misrepresentation. In its brief, Borla identifies several statements made by UTE employees that Borla says were unfair or misleading, which we quote: (1) "UTE claimed itself as a specialist with the ongoing ability to repair, rebuild and refurbish bending machines"; (2) "Nowhere did Mr. Raby state that he may have to consult outside expert advice or that UTE was not qualified to conduct all required work"; (3) "it was deceptive for UTE to represent deadlines when it could not knowingly deliver the services by the contractually agreed upon dates"; (4) UTE "never advised Borla that it was 'impossible' to complete the work on the California benders by the end of May, 2008"; (5) "UTE stated to Borla on December 12, 2007 that 'we'll take good care of your machines and will present all costs fairly.' " None of these statements, taken either separately or together, is actionable under the TCPA. Assuming, arguendo, that these statements were made, they are not false, deceptive, misleading, or unfair; nor did they result in an ascertainable loss by Borla. *See Morrison v. Allen*, 338 S.W.3d 417, 440 (Tenn. 2011) ("A private cause of action under the TCPA is only available where a plaintiff can show "ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice.").

V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, Borla Performance Industries, Inc. The case is remanded to the trial court for enforcement of the judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

27